OPINION OF THE COURT
Thomas A. Dickerson, J.
After trial the court makes the following findings of fact and conclusions of law:
*806 In 1987 the defendant decided to purchase a multifamily house located at 291 McLean Avenue, City of Yonkers, New York (the McLean Avenue property). The McLean Avenue property contained seven apartments which had been generating rents since, at least, 1982 when the building was purchased by its then owner.
The defendant retained the plaintiffs to represent his interests in purchasing the McLean Avenue property and agreed to pay plaintiffs’ fee of $1,500 plus costs. The plaintiffs reviewed the contract of sale which contained a rent roll identifying the seven tenants and the apartments they occupied, their security deposits, their monthly rents and the expiration dates of their leases.
On December 23, 1987 the plaintiffs attended the closing on the McLean Avenue property for which the defendant paid $165,000. In consideration for their legal services the defendant paid plaintiffs’ fees and costs of $1,536.50.
Thereafter, plaintiffs continued to represent the defendant in a variety of matters related to the McLean Avenue property.
For three and one-half years the defendant rented out the seven apartments in the McLean Avenue property.
On July 8, 1991 the Yonkers Bureau of Housing and Buildings (BHB) served defendant with a notice of violation stating "As a result of an inspection made * * * on June 20, 1991, you are hereby notified that the * * * premises owned * * * by you is in violation of the following sections of the New York Uniform Fire Prevention and Building Code, or Yonkers Fire and Building Code, or both: Owner constructed an illegal basement apartment (IB) in a (6) six family apartment home. The apartment consists of a kitchen, living room, 2 rear bedrooms and 2 baths * * * Yonkers Fire & Building Code — 33-3-1 A, 33-5-1A, 33-5-6 * * * note: correction of all violations must COMMENCE IMMEDIATELY”.
Plaintiffs recommended that an application be made to the Yonkers Zoning Board of Appeals for a "variance to permit the premises to be used as a seven-family house”. The defendant agreed with this strategy and authorized plaintiff to seek a variance. After considerable effort the plaintiffs obtained a variance which required that a new certificate of occupancy (CO), building permits, alarm systems and plans be obtained. After an initial denial a new CO was finally issued on June 2, 1992 nearly one year after defendant received the notice of violation. The CO now described the McLean Avenue property as "7-family multiple dwelling”.
*807 The defendant refused to pay plaintiffs for their services in obtaining a variance and new CO. As a consequence, plaintiff commenced this breach of contract action seeking unpaid legal fees and costs of $3,496.56.
In response, the defendant counterclaimed charging plaintiffs with "malpractice and negligence * * * in representing the Defendant in the purchase of the (McLean Avenue property)” and seeking damages of $25,000.
DISCUSSION

Plaintiffs Shall Have Their Fees And Costs

The defendant authorized the plaintiffs to obtain a variance and CO for the McLean Avenue property and agreed to pay plaintiffs their fees and costs. The plaintiffs rendered appropriate legal services and expended monies on defendant’s behalf and obtained the variance and the CO as requested. Several bills were sent to defendant to which no objections were made. In addition, the defendant neither challenged the quality of plaintiffs’ services nor the results achieved (see, e.g., Glazer v Falberg, 85 AD2d 938, 939 [1981] ["No objection was ever interposed to any of these schedules or bills. Nor were there any complaints about the quality of the services.”]; Fink, Weinberger, Fredman, Berman & Lowell v Petrides, 80 AD2d 781 [1981] ["no challenge to the legitimacy or accuracy of the bill was ever made”]). The plaintiffs shall have judgment against defendant for $3,496.56 together with 9% interest from January 23, 1992.

Defendant’s Malpractice Claim

The defendant claims that in 1987 plaintiffs failed to investigate and discover that apartment IB in the McLean Avenue property was illegal and, hence, unrentable. Notwithstanding that seven apartments were listed in the contract of sale it is claimed that plaintiffs negligently failed to advise defendant that the property had only six legal and rentable apartments. As a consequence the defendant lost 13 months’ rent ($6,500), paid $3,573.54 in costs related to obtaining a variance and CO and incurred legal fees and costs of $3,496.56.

Statute Of Limitations

As a threshold issue the plaintiffs have moved to dismiss defendant’s counterclaim on the grounds that it is barred by a *808 three-year Statute of Limitations (see, e.g., Tal-Spons Corp. v Nurnberg, 213 AD2d 395, 396 [1995]; Goldberg v Bosworth, 215 NYS2d 849 [Sup Ct, Kings County 1961]). Specifically, plaintiffs assert that the alleged malpractice occurred on or prior to the December 23, 1987 closing and that defendant’s counterclaim was filed on January 25, 1993. Hence, since the counterclaim was asserted more than three years after the alleged malpractice took place it should be dismissed.
The plaintiffs’ motion must be denied for two reasons. First, the plaintiffs continued to represent defendant on various real estate matters involving the McLean Avenue property ("There were a number of times when we represented [defendant] with regard to continuing problems that one normally has with a residential building”). Under the continuous representation rule the Statute of Limitations would be tolled until plaintiffs’ representation ceased (see, e.g., Glamm v Allen, 57 NY2d 87, 94 [1982] ["Since it is impossible to envision a situation where commencing a malpractice suit would not affect the professional relationship, the rule of continuous representation tolls the running of the Statute of Limitations on the malpractice claim until the ongoing representation is completed”]; Tal-Spons Corp. v Nurnberg, 213 AD2d 395, supra; Anderson Co. v Devine, 202 AD2d 382 [1994]; Stampfel v Eckhardt, 143 AD2d 184 [1988]; Muller v Sturman, 79 AD2d 482, 485-486 [1981] ["continuous representation doctrine * * * envisions a relationship between the parties that is marked with trust and confidence * * * involves a continuity of the professional services from which the alleged malpractice stems”]).
It is reasonable to conclude that plaintiffs continuously represented the defendant regarding the McLean Avenue property from before the December 23, 1987 closing to the issuance of the CO on June 2, 1992. Hence, the three-year Statute of Limitations would have been tolled until June 2, 1992 making defendant’s assertion of his counterclaim on January 25, 1993 timely.
Second, plaintiffs were hired to perform specific legal services, i.e., represent defendant in purchasing the McLean Avenue property. At the very least, such representation would include reviewing the contract of sale and verifying the accuracy of the promises therein (i.e., were there seven legal and rentable apartments?); contacting governmental agencies and determining if there were any encumbrances on the property including code violations, obtaining title insurance and attending the closing. In essence, there was a contractual relation *809 ship between plaintiffs and defendant and therein lies "an implied promise to exercise due care in performing the services required by the contract” (Santulli v Englert, Reilly & McHugh, 78 NY2d 700, 705 [1992]).
In his answer the defendant asserted only one counterclaim styled as "malpractice and negligence”. Notwithstanding the absence of a pleaded breach of contract claim, it is the nature of the remedy sought which justifies the application of a six-year Statute of Limitations (see, Santulli v Englert, Reilly & McHugh, supra, 78 NY2d, at 707 [" 'the choice of applicable Statute of Limitations is properly related to the remedy rather than to the theory of liability’ * * * 'whether verbalized as in tort for professional malpractice or as in contract for nonperformance of particular provisions of the contract, arose out of the contractual relationship of the parties — i.e., absent the contract between them, no services would have been performed and thus there would have been no claims’ * * * all potential liability * * * arises out of the agreement retaining the firm as attorneys * * * in respect to the sale of his business”]; Sinopoli v Cocozza, 105 AD2d 743 [1984]).
Whether defendant’s counterclaim is viewed as one in tort and/or in contract it has been timely asserted and is properly before this court.

Defendant’s Burden Of Proof

Legal malpractice claims arising from real estate transactions (see, e.g., Santulli v Englert, Reilly & McHugh, supra, 78 NY2d, at 705, 706 [" 'failing to properly draw and record such a first mortgage’ ”]; Plentino Realty v Gitomer, 216 AD2d 87 ["inclusion of the contract of sale along with the option contract (against instructions)”]; Sucese v Kirsch, 177 AD2d 890, 891 ["failed to record the deed for over a year”]; Sager v DeRiggi, 161 AD2d 571 [1990] ["lease * * * incorrectly reflected the date * * * of an option to renew”]; O’Brien v Spuck, 99 AD2d 910, 911 ["failing to advise (that mortgage obtained)”]; Cicorelli v Capobianco, 89 AD2d 842 [1982] ["(lawyer) advised his clients * * * that they had no further obligations under a conditional contract for the sale of real property when, in fact, they were bound to diligently apply for rezoning and pay taxes on the property”]) are, typically, premised upon a failure to investigate and advise the seller or buyer of some relevant information, the lack of which generates damages (compare, Lewis v Desmond, 187 AD2d 797 [1992] [faulty legal advice regarding liquor license]; Marks Polarized *810 Corp. v Solinger & Gordon, 124 Misc 2d 266 [failure to investigate patent frauds]).
To establish a claim for legal malpractice the defendant must prove " 'that the attorneys were negligent, that their negligence was the proximate cause of the * * * damages, and that the * * * damages [were] a direct result of the attorney’s actions’ ” (Plentino Realty v Gitomer, 216 AD2d, at 88, supra). When viewed as a failure to render proper advice the defendant must prove that "the attorney negligently * * * gave improper advice * * * which was a proximate cause of the client’s doing of things he would not otherwise have done * * * resulting in * * * damage to the client” (Marks Polarized Corp. v Solinger & Gordon, 124 Misc 2d 266, 267, supra).

Defendant Has Failed To Prove Negligence

Under the circumstances of this case the defendant has failed to establish that plaintiff breached any duty owed to him. First, the defendant has failed to prove that there was any information available in 1987 from which it could reasonably be concluded that apartment IB was illegal and unrentable. Second, the defendant has failed to establish that apartment IB was illegal and unrentable in 1987 or at any other time prior to July 8, 1991 when the notice of violation was received.

Absence Of Readily Available Information

Defendant’s malpractice claim is premised upon a duty to discover readily available information, i.e., that apartment IB in the McLean Avenue property was illegal and unrentable. In fact, such information was not readily available. The seller had, apparently, been renting apartment IB for five years prior to 1987. The Yonkers BHB had no record of any violations on the property. There was no CO to examine since none had been issued. The BHB property record card had information ("9-17-75 6 apt. all controlled”) which suggested that the property had six rent-controlled apartments. Such information did not mean, however, that only six apartments were legal. In addition, the analysis of the Assessor of the City of Yonkers revealed that the property was "included on Assessment documents as 7 units since at least 1975”.

Illegal Apartments In Yonkers

An apartment is deemed illegal in the City of Yonkers when it fails to meet the New York Code of Rules and Regulations *811 regarding habitable space and/or the Yonkers Fire and Building Codes (see, Bartolomeo v Bunco, NYLJ, Aug. 5, 1994, at 32, col 5 [Yonkers City Ct]).
Illegal apartments in the City of Yonkers have traditionally been ignored and have not been the subject of consistent BHB enforcement action. As a consequence, illegal apartments constitute an extraordinary drain on municipal resources. "It has been estimated that there are between 5,000 to 10,000 illegal apartments in the City of Yonkers * * * Using our conservative estimate of 5,000 illegal units this means that between $1 million to $1.5 [million] of property taxes goes unpaid annually * * * On the cost side, the impact is even more startling * * * [the City is providing] $6.29 million in these basic services to a category of household that may not be paying their way” (Bartolomeo v Runco, supra).
The proliferation of illegal apartments has also reduced property values and demoralized other homeowners. " '[Illegal] apartments burden the area homeowner who does not violate or bend the code. The city’s compact with its homeowners is that the city provides services for the taxes paid by the homeowner. One of those services is the assurance of value derived from zoning * * * As a municipality which needs to upgrade its image as a desirable place to live and work, it is desirable for the city government to ensure and strengthen the best of its resources, that is, Yonkers’ fine single and two-family residential neighborhoods.’ ” (Bartolomeo v Runco, supra.)

The Proximate Cause Of Defendant’s Damages

The damages suffered by the defendant are the proximate result, not of any malpractice by the plaintiffs, but of the failure of the City of Yonkers to consistently enforce its own rules and regulations. " 'There is a common feeling voiced [by] many citizens and would-be homeowner[s] in Yonkers that there is no certainty that their single-family home purchase and their decision to locate in Yonkers will be validated and protected by the city. Yonkers needs to provide a level of certainty to potential residents that their home purchase is protected by municipal laws which are enforced. The most effective means of accomplishing this goal is through the city’s strict enforcement of existing zoning.’ ” (Bartolomeo v Runco, supra).
Because of a lack of enforcement homeowners may reasonably conclude that, notwithstanding code violations, illegal apartments are, simply, not illegal. Laws which are not enforced are often ignored. This explains why 5,000 to 10,000 *812 otherwise law-abiding, Yonkers taxpayers have illegal apartments. In essence, in 1987 apartment IB in the McLean Avenue property was not illegal in any meaningful sense. It was not until July 8, 1991 when BHB decided to enforce its rules and regulations that apartment IB became illegal.
Although defendant made a profit of nearly $100,000 on the sale of the McLean Avenue property, he also incurred a loss of rental income and out-of-pocket costs of over $13,000 after apartment IB was declared to be illegal. These losses were not caused by any action or inaction of the plaintiffs but are one of the unanticipated costs of doing business in the City of Yonkers.
Judgment is rendered in favor of plaintiff Farrauto, Berman, Fontana & Selznick against defendant Vorasak Keowongwan for actual damages of $3,496.56 together with $1,127.64 interest for a total for plaintiff of $4,624.20.
Defendant’s counterclaim for malpractice and negligence is dismissed.
[Portions of opinion omitted for purposes of publication.]