MASON TENDERS DISTRICT COUNCIL
PENSION FUND, et al., Plaintiffs,

v.

James MESSERA, et al., Defendants.

No. 95 Civ. 9341(RWS).

United States District Court,
S.D. New York.

March 26, 1997.

Proskauer Rose Goetz & Mendelsohn, New York City (Myron D. Rumeld, Nancy Kilson, of counsel), for Plaintiffs.

Vedder, Price, Kaufman, Kammholz & Day, Levin & Weissman and Roger Levin, New York City (John H. Eickemeyer, Neil A. Capobianco, Taryn V. Shelton, of counsel), for Defendants.

Ohrenstein & Brown, Cunningham & Lee and Gerard Cunningham, New York City (Christopher B. Hitchcock, Philip Touitou, of counsel), for Defendants.

Kramer, Levin, Naftalis & Frankel, Joseph Albanese and Albanese, Albanese & Fiore, New York City (Philip S. Kaufman, Marjorie E. Sheldon, of counsel), for Defendants.

SWEET, District Judge.

Defendants Roger Levin ("Levin") and Levin & Weissman ("L & W") (collectively, the "Levin Defendants") have moved pursuant to Rule 12(b)(6), Fed.R.Civ.P. to dismiss all of the claims asserted against them by plaintiffs, the Mason Tenders' District Council Trust Funds (the "Funds").[1] The Funds have cross-moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P., with respect to their claims for breach of fiduciary duty.

Defendants Joseph Albanese ("Albanese") and Albanese, Albanese & Fiore ("AA & F") (collectively, the "Albanese Defendants") have moved for summary judgment dismissing the claims against them.

---

1. The Funds include the Mason Tenders' District Council Pension, Welfare, Annuity, Asbestos Training, Industry, Legal Services and Vacation Funds.

Defendants Gerard Cunningham ("Cunningham") and Cunningham & Lee ("C & L") (collectively, the "Cunningham Defendants") have moved for partial summary judgment dismissing certain of the legal malpractice claims against them.

For the reasons set forth below, the Funds' motion for summary judgment will be denied; the Levin Defendants' motion to dismiss will be granted in part and denied in part; the Albanese Defendants' motion for summary judgment will be granted; and the Cunningham Defendants' motion for partial summary judgment will be granted in part and denied in part.

### The Parties

The parties, prior proceedings and facts in this action have been fully set forth in two prior opinions of the court, familiarity with which is assumed. *See Mason Tenders District Council Pension Fund v. James Messera*, 1996 WL 351250 (S.D.N.Y. June 26, 1996); *Mason Tenders District Council Pension Fund v. James Messera*, 1996 WL 578048 (S.D.N.Y. Oct.8, 1996). The facts relevant to the instant motions are set forth below.

The Funds consist of various "employee pension benefit plans" or "employee welfare benefit plans" within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1002(3). The Funds provide benefits to members of local unions affiliated with the Laborers' International Union of North America ("LIUNA"), which local unions together comprise the Mason Tenders' District Council of Greater New York (the "District Council"). The Funds are administered by the District Council and contributing employers in the industry.

Defendants Cunningham, Levin and Albanese are attorneys and Defendants C & L, L & W and AA & F are their respective law firms.

### Prior Proceedings

The Funds are trust funds established under the auspices of the District Council which have provided benefit plans to the members of the Mason Tenders' local unions which are organized as part of LIUNA. The District Council, the governing body of the local unions, entered into a consent decree on December 27, 1994 in a civil action, *U.S. v. Mason Tenders District Council*, 94 Civ. 6487(RWS), brought by the Government against it alleging violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), including certain improprieties with respect to the administration of the Funds.

On November 2, 1995, this action was commenced, pleading eighty-four causes of action against nearly fifty separate defendants. The gravamina of this action are the first four claims, which plead violations of 18 U.S.C. §§ 1962(b) and of RICO, and of 18 U.S.C. § 1962(d), conspiracy to violate 18 U.S.C. § 1962(b) and (c). The remaining causes of action allege various statutory and common law claims.

The Levin Defendants' motion to dismiss was filed on April 22, 1996. Thereafter, the Funds cross-moved for partial summary judgment. Oral argument on both motions was heard on October 2, 1996. The Court received further submissions through December 12, 1996, at which time the motions were deemed fully submitted.

The Albanese Defendants' motion for summary judgment was filed on October 22, 1996. Oral argument was heard on February 5, 1997, at which time the motion was deemed fully submitted.

On August 20, 1996, the Funds moved to amend the complaint to add the Cunningham Defendants. The motion was granted on September 23, 1996, and the Amended Complaint (hereinafter, the "Complaint") was filed on October 2, 1996. The Cunningham Defendants' motion to dismiss was filed on November 22, 1996. Oral argument was heard on March 5, 1997, at which time the motion was deemed fully submitted.

### I. The Complaint

### A. Fraudulent Real Estate Transactions

The Complaint alleges that between November 1989 and February 1990, the Funds purchased eight properties in Brooklyn, New

York (the "Brooklyn Properties") based on "false and fraudulent real estate appraisals that grossly inflated the true value" of these properties. The Brooklyn Properties were purchased from a member of the Genovese Organized Crime Family, Charles Trentacosta, and Trentacosta made a profit of $1,341,903.05 in the transaction.

At around the same time, the Funds were the victim of a separate fraudulent transaction involving a property located at 32–36 West 18th Street (the "18th Street Building"). The Complaint alleges that in December 1989, defendant Ronald Miceli, now a convicted racketeer, arranged to purchase the 18th Street Building for $7,465,000. Miceli obtained a $15,850,000 loan from the Pension Fund in February 1990 in order to purchase the Building. As security for the loan, the Pension Fund obtained a mortgage on the 18th Street Building and on another piece of commercial property owned by Miceli in Long Island, New York. The loan had previously been discussed at a Trustees meeting held on December 6, 1989, and its consummation was reported to the Trustees by the Funds' real estate counsel at a subsequent meeting held on March 8, 1990. The minutes of that meeting show that there was discussion concerning the transaction, including an inquiry as to whether there were limitations in the Trust documents on the percentage of Pension Fund assets that could be invested in real estate. There is no indication in these minutes or any subsequent minutes that any of the attorneys present responded to that inquiry.

On the same date Miceli procured the loan, he purchased the building for $7,465,000. Approximately eight months later, at a Trustees meeting conducted on November 13, 1990, the Trustees approved the Pension Fund's purchase of the 18th Street Building from Miceli for $24 million. There is no evidence of any explanation as to why the property was purchased for nearly $10 million more than the amount of the loan made nine months earlier, and about $16.5 million more than the price Miceli had obtained.

Nor is there any evidence to suggest that any inquiry was made into the existence of appraisals that would justify the $24 million purchase price.

Furthermore, there is no evidence in the Trustees Meeting minutes to suggest that any of the professionals alerted the Trustees to the fact that their fiduciary liability policy contained an exclusion which stated: "coverage as provided hereunder shall apply to an investment by the Fund in real estate and/or mortgage that is: ... specifically directed or approved by and managed by a Qualified Professional Asset Manager ('QPAM')."

Shortly before the loan transaction in February, the Fund had obtained three appraisals on the 18th Street Building. Two of the appraisals valued the property at approximately $15,900,000, while the third valued it at only $8,300,000. The third appraisal also noted that the property had been purchased just two years earlier for only $7.7 million. As of October 1993, the 18th Street Building was valued at $5 million, notwithstanding the fact that the Pension Fund had by then invested several million dollars in renovating the site, over and above the $24 million purchase price.

In the related civil action filed by the Government, this Court granted summary judgment against two of the Funds' former Trustees, Joseph Fater and James Lupo, finding that they had breached their fiduciary duties in connection with the purchase of the 18th Street Building. *See United States v. Mason Tenders District Council,* 909 F.Supp. 882, 887 (S.D.N.Y.1995). The Court entered a judgment in the amount of $16,535,000 for losses associated with the purchase of the 18th Street Building.[2]

A third fraudulent real estate transaction occurred with respect to a property located at 6060 Indian Creek Drive, Miami Beach, Florida (the "Indian Creek Property"). The Complaint alleges that in 1987, one of the Funds purchased the Indian Creek Property from the mother of defendant James Mess-

---

**2.** The losses were determined based on the difference between the price at which Miceli had purchased the property ($7,465,000), which was deemed to be the fairest assessment of the fair market value at the time, and the amount that the Pension Fund paid for the property ($24,000,000) nine months later. *See* 909 F.Supp. at 891, 894–95. .

era, a "capo" in the Genovese Organized Crime Family and now a convicted racketeer. The $1.45 million purchase price paid by the Welfare Fund was allegedly twice the property's appraised value.

### B. *The Pervale Litigation*

Another of the transactions addressed by the Complaint relates to the renovation of the 18th Street Building following its purchase by one of the Funds, and a subsequent lawsuit with the contractor over payment for the work. The Complaint alleges that after the Pension Fund bought the 18th Street Building in 1990, it spent $5.62 million to renovate the property although the property's market value was thereafter appraised at only $5 million. It is further alleged that the contractor hired to perform the renovation, defendant Pervale Contracting Company ("Pervale"), and Pervale's principal, defendant Salvatore Leotta ("Leotta"), paid kickbacks of at least $150,000 to corrupt representatives of the Pension Fund in order to obtain the job.

On or about June 8, 1994, after the renovation work had been completed, Pervale commenced an action against the Pension Fund, 32–36 Corp. and several subcontractors in order to foreclose a mechanics lien, contending that it was owed money for the renovation work on the 18th Street Building. Pervale moved for summary judgment in the action and, by opinion dated August 16, 1995, was awarded a judgment against 32–36 Corp. in the amount of $398,798.00. That judgment is now on appeal.

By Opinion dated June 26, 1996, the Court denied defendants' Salvatore Leotta ("Leotta") and Pervale Contracting Company's ("Pervale") motion for summary judgment.

## II. *The Levin Defendants*

### A. *Activities in Connection With the Funds*

During the period that is the subject of the Government's investigation and this lawsuit, the law firm of Levin & Weissman served as Funds' counsel, first through Harold Levin and then through his son Roger Levin ("Levin"). The Levin Defendants provided various legal services that included regular attendance at Trustees' meetings; membership in the Funds' investment Committee; special litigation counsel for benefit cases: provider to the Legal Services Plan; and a collections practice.

For the six-year period between 1989 and 1994, the Levin Defendants received $15,631,367 for these legal services. In addition, Chetwood Publishing Co., a company in which Levin owned a fifty percent interest, received $1,534,959 in fees during this period from the Mason Tenders' District Council Industry Fund for publishing the *Mason Tender* magazine.

The legal services the Levin Defendants provided to the Funds were secured in whole or in part through the payment of kickbacks to Fund officials responsible, directly or indirectly, for hiring and retaining the Funds' service providers. Harold Levin has stated under oath that he started paying bribes to various union officials in the late 1950's or early 1960's in order to secure the Funds' legal business for the firm, and that he continued to do so on a routine basis. The practice was continued by Levin, first at the behest of his father, and then on his own. The payments were at times as large as $8,000–$10,000 per month.

In addition, Levin stated that he paid numerous kickbacks to secure the business of Chetwood Publishing Co. In return for the publishing contract, Levin regularly paid former Trustee Frank Lupo ten percent of Chetwood's revenues.

Former Trustee Frank Lupo described payment of these kickbacks:

> We had a large conference room at the Welfare Fund. And we would just, we would all arrive there at a certain time, we'd just walk off into a corner, have coffee, and held pass the envelope. Basically that was it.

The Levin Defendants specifically recalled making payments to various Fund officials, including former Trustees Frank Lupo and James Lupo and Ernie Muscarella, the former Supervisor of the Field Representatives for the Funds. The payments totaled over $160,000.

The Levin Defendants' representation of the Funds ended in 1994, when they resigned as counsel.

### B. *Claims Against the Levin Defendants*

The Complaint alleges several claims against the Levin Defendants. The Sixty-Eighth Claim alleges that the Levin Defendants breached their duties to the Funds by paying kickbacks to Fund officials. The Fifty-Eighth Claim alleges that the Levin Defendants' failure to advise the Funds that the purchase price for the 18th Street Building was grossly inflated, and that the Funds should retain a Qualified Professional Asset Manager, constituted legal malpractice as well as breach of fiduciary duty. The Complaint also includes a RICO claim against the Levin Defendants based on their payment of kickbacks in exchange for their continued retention, and a claim for violation of ERISA.

### III. *The Albanese Defendants*

#### A. *Activities In Connection With the Funds*

##### 1. *Real Estate Transactions*

The Funds claim to have had an attorney-client relationship with Albanese and AA & F when the above-described real estate purchases were made. The Minutes of the Regular Joint Meetings of the Board of Trustees of the Mason Tenders District Council Pension, Welfare and Annuity Funds (the "Minutes") contain no affirmative representation that Albanese or AA & F represented the Funds during this period. The Albanese Defendants were identified as counsel to Anthony J. Zotollo ("Zotollo"), one of the Funds' employer-designated trustees. The Funds were represented by the Levin Defendants and by the law firm of Davis & Davis.

As Zotollo's personal attorney, Albanese accompanied Zotollo to Trustees' meetings and advised him individually concerning matters about which Zotollo consulted him. Zotollo has attested that he did not consult Albanese about investments by the Funds. For advice on matters of that nature, including the real estate transactions at issue here, Zotollo consulted with the professionals hired by the Funds for their expertise in investments.

At a Board of Trustees' meeting on November 4, 1992, a resolution was proposed, and thereafter adopted, appointing Albanese to serve as co-counsel to the Real Estate Committee. Eight months later, at a Board of Trustees' meeting held on July 7, 1993, Albanese was appointed to serve as "Co-Counsel to the Funds." The Minutes do not reflect that Albanese or his firm ever acted, or was asked to act, as the Funds' counsel during the period prior to these appointments.

The Declarations of Trust, under which the Funds were created, authorized the Trustees, including Zotollo, to obtain reimbursement from the Funds for the expenses they incurred in performing their duties. The Funds' Administrator, Ms. Audrey Hinkly, instructed Albanese to send AA & F's bills for representing Zotollo directly to the Funds rather than requiring Zotollo to pay the bills in the first instance and thereafter obtain reimbursement from the Funds. Albanese and AA & F followed those instructions throughout the period they served as Zotollo's counsel.

##### 2. *The Pervale Litigation*

The Funds were represented initially in the Pervale litigation by defendant C & L, and subsequently by the firm of Manning, Raab, Dealy & Sturm. In the answer originally served on behalf of the Funds in response to Pervale's complaint, C & L listed AA & F as its co-counsel. Albanese contends that this listing was unauthorized by AA & F and merely the result of an administrative mistake by C & L.

Albanese corrected the error by executing a written Consent to Change Attorney signed by the Funds, as well as by C & L. The Consent was finalized approximately four months before any decision on Pervale's summary judgment motion was rendered.

#### B. *The Claims Against Albanese and AA & F*

The Complaint alleges four malpractice claims against the Albanese Defendants. Three of those claims arise from the Funds'

purchase of the Brooklyn Properties, the 18th Street Building and the Indian Creek Property. Thus, the Fifty-seventh claim relates to the purchase of the Brooklyn Properties; the Sixty-third claim relates to the purchase of the 18th Street Building; and the Sixty-ninth claim relates to the purchase of the Indian Creek Property.

Each of these claims alleges that there was a contractual relationship between the Funds and the Albanese Defendants, pursuant to which the Albanese Defendants agreed to provide legal services to the Funds; that the Funds paid the Albanese Defendants for such legal services; that the Albanese Defendants routinely attended meetings of the Boards of Trustees of the Funds, including meetings where the Investment Committee and Real Estate Committee presented reports and recommendations, and the Funds looked to the Albanese Defendants for legal advice; that the parties' "attorney-client relationship" created a duty to represent the Funds with the reasonable care; and that the Albanese Defendants had a duty to advise the Funds that the purchase prices for properties in question were grossly inflated and that the Funds should have retained a Qualified Professional Asset Manager in connection with their purchases of the properties.

The final claim against Albanese and AA & F, the Seventy-ninth count of the Complaint, challenges the adequacy of the defense provided to the Funds in connection with the motion for summary judgment in the Pervale Litigation. The Funds allege that the papers submitted in opposition to the motion failed to alert the Court to facts and circumstances indicating that Pervale had obtained the renovation contracts through fraudulent means and had overcharged for the renovations.

## IV. *The Cunningham Defendants*

### A. *Activities in Connection with the Funds*

The Cunningham Defendants served as counsel to both the Funds and the Real Estate Committee from 1987, when the Funds first began purchasing the real estate properties at issue in this litigation, until March 1995. They regularly attended meetings of the Real Estate Committee and the Funds' Board of Trustees. The Cunningham Defendants were counsel of record for the Funds in the Pervale litigation. As of December 1994, the Cunningham Defendants were still reporting to the Funds about real estate matters. The Cunningham Defendants' representation of the Funds ended on March 9, 1995, when they resigned as counsel.

### B. *The Claims Against the Cunningham Defendants*

The Complaint's Fifty-eighth, Sixty-fourth, Seventieth, Seventy-seventh and Eightieth claims for relief address the Funds' malpractice claims against the Cunningham Defendants arising out of the real estate transactions described above. In its Fifty-eighth, Sixty-fourth and Seventieth claims for relief, the Complaint alleges that, because of their capacity as members of the Funds' Real Estate Committee and their routine attendance at Board of Directors meetings, the Cunningham Defendants should have known that the purchase prices for the properties were grossly inflated and they should have advised the Pension Fund to retain a "QPAM" in connection with the purchase of the properties.

The Complaint's Seventy-seventh claim for relief asserts that the Cunningham Defendants should have known that renovations to the 18th Street Building were unnecessary or improper and that charges for the renovations were grossly inflated. The Eightieth claim for relief alleges that the Cunningham Defendants failed to include a termination provision in favor of the Fund during the negotiation of a contract between the Fund and Stein Gerontological Institute, Inc. ("Stein") entered into "on or about May of 1992" in connection with the management of the Indian Creek Property.

The Complaint further alleges, in the Seventy-eighth claim for relief, that the Cunningham's failure to vigorously defend the Funds in the Pervale litigation, which was commenced in 1994, constitutes malpractice.

## Discussion

### I. *The Levin Defendants' Motion to Dismiss*

On a Rule 12(b)(6) motion to dismiss, the factual allegations of the complaint are presumed to be true and all factual inferences must be drawn in the plaintiff's favor and against the defendants. *See Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989); *Dwyer v. Regan,* 777 F.2d 825, 828–29 (2d Cir.1985). Accordingly, the factual allegations considered here and set forth below are taken from Plaintiffs' Amended Complaint and do not constitute findings of fact by the Court. They are presumed to be true only for the purpose of deciding the present motion to dismiss.

Rule 12(b)(6) imposes a substantial burden of proof upon the moving party. A court may not dismiss a complaint unless the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). *Accord Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984) (quoted in *H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 250–51, 109 S.Ct. 2893, 2906, 106 L.Ed.2d 195 (1989)).

"In practice 'a complaint ... must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" *Fort Wayne Telsat v. Entertainment & Sports Prog. Network,* 753 F.Supp. 109, 111 (S.D.N.Y.1990) (quoting *Car Carriers, Inc. v. Ford Motor Co.,* 745 F.2d 1101, 1106 (7th Cir.1984)).

Rule 8(a)(2) of the Federal Rules of Civil Procedure mandates that a complaint contain a "short and plain statement of the claim" that demonstrates "that the pleader is entitled to relief." The Federal Rules do "not permit conclusory statements to substitute for minimally sufficient factual allegations." *Furlong v. Long Island College Hosp.,* 710 F.2d 922, 927 (2d Cir.1983).

### II. *The Motions For Summary Judgment*

Rule 56(e) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Silver v. City Univ.,* 947 F.2d 1021, 1022 (2d Cir.1991).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1060 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988); *Matsushita Elec. Indus. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

A party seeking to defeat a summary judgment motion, however, cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome the motion." *Lipton v. Nature Co.,* 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.,* 804 F.2d 9, 12 (2d Cir.1986)). The responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.,* 887 F.Supp. 560, 564 (S.D.N.Y.1995) (no issue of material fact in a copyright case where ownership of valid copyright registrations and copying of musical compositions were undisputed).

### III. *The Breach of Fiduciary Duty Claim is Preempted*

The Levin Defendants contend that the Funds' claim for common law breach of fiduciary duty is preempted by ERISA and must be dismissed. The Funds, as ERISA plans, allege that L & W and Levin, as ERISA plan counsel, breached their common law fiduciary duty to the ERISA plans by

making payments to ERISA plan fiduciaries in exchange for receiving legal work on behalf of the ERISA plans.

■ ERISA explicitly "supersede[s] any and all State laws insofar as they may now or hereafter relate to any [ERISA] plan." 29 U.S.C. § 1144(a). ERISA preempts "any state law that refers to or has a connection with covered benefit plans ... even if the law is not specifically designed to affect such plans, or the effect is only indirect, and even if the law is consistent with ERISA's substantive requirements." *District of Columbia v. Greater Washington Board of Trade*, 506 U.S. 125, 130, 113 S.Ct. 580, 583, 121 L.Ed.2d 513 (1992) (internal citations omitted). Held by the Supreme Court to be "deliberately expansive" and "conspicuous for its breadth," ERISA's preemption provision "displace[s] all state laws that fall within its sphere," including common law claims. *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 407–08, 112 L.Ed.2d 356 (1990); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 46, 107 S.Ct. 1549, 1552, 95 L.Ed.2d 39 (1987).

■ ERISA's civil enforcement mechanism, 29 U.S.C. § 1132(a), is intended to be the exclusive method of enforcing its substantive provisions. *Pilot Life*, 481 U.S. at 52, 107 S.Ct. at 1555. Indeed, "[t]he six [now nine] carefully integrated civil enforcement provisions found in [29 U.S.C. § 1132(a) ] ... provide strong evidence that Congress did not intend to authorize other remedies that it simply forgot to incorporate expressly." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146, 105 S.Ct. 3085, 3092, 87 L.Ed.2d 96 (1985). As the Supreme Court stated in *Pilot Life:*

> The deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies argue strongly for the conclusion that ERISA's civil enforcement remedies were intended to be exclusive.

*Pilot Life*, 481 U.S. at 54, 107 S.Ct. at 1556–57. Moreover, Congress's "expectations that a federal common law of rights and obligations under ERISA-regulated plans would develop ... would make little sense if the remedies available to ERISA participants and beneficiaries under [29 U.S.C. § 1132(a)] could be supplemented or supplanted by varying state laws." *Id.* at 56, 107 S.Ct. at 1557.

■ ERISA preempts common law causes of action that "purport[ ] to provide a remedy for the violation of a right expressly guaranteed by [ERISA]." *Ingersoll–Rand*, 498 U.S. at 145, 111 S.Ct. at 486. Thus, "[a] state common law action which merely amounts to an alternative theory of recovery for conduct actionable under ERISA is preempted." *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 288 (2d Cir. 1992). Since the Funds' common law breach of fiduciary duty claim alleges conduct that would be actionable under ERISA, the Funds' state law claim for breach of fiduciary duty is preempted.

Plaintiffs' claim against the Levin Defendants for breach of fiduciary duty is based on the allegation that Levin and L & W made payments to Fund fiduciaries in order to ensure the continued use of L & W's legal services for the Funds and their beneficiaries. ERISA expressly prohibits fiduciaries—such as the Lupos and Muscarella—from "receiv[ing] any consideration for [their] own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b)(3). Moreover, the Supreme Court has expressly held that L & W's and Levin's alleged conduct is actionable under ERISA:

> Professional service providers ... must disgorge assets and profits obtained through participation as parties-in-interest in transactions prohibited by [29 U.S.C. § 1106].

*Mertens v. Hewitt Associates*, 508 U.S. 248, 260–64, 113 S.Ct. 2063, 2071–72, 124 L.Ed.2d 161 (1993).

Under *Mertens*, L & W and Levin, as parties-in-interest pursuant to 29 U.S.C. § 1002(14)(A), can be required under ERISA enforcement provisions to disgorge assets and profits obtained through participation in the prohibited transactions alleged. Plaintiffs' claim thus "merely amounts to an alternative theory of recovery for conduct action-

**880**

able under ERISA [and] is preempted." *See Diduck,* 974 F.2d at 288.

In *Crimi v. PAS Indus., Inc.,* No. 93 Civ. 6394, 1995 WL 272580, at *7–8 (S.D.N.Y. May 9, 1995), this Court found a common law claim against an alleged party in interest for knowing participation in a fiduciary's breach of duty to be preempted by ERISA. In *Crimi,* like here, plaintiffs argued against preemption, claiming that the doctrine does not apply to areas that ERISA does not regulate. The court rejected this contention, finding that state law claims that are analogous to claims maintainable under ERISA— in that case an ERISA claim for participating in a fiduciary's breach of duty—are preempted. *Crimi* requires dismissal on the similar facts presented here.

Those courts that have specifically addressed ERISA preemption of breach of fiduciary duty claims hale held, in the context of benefit plans such as the Funds, that fiduciary duties traditionally recognized at common law are governed solely by ERISA. Accordingly, common law breach of fiduciary duty claims involving ERISA benefit plans, even when asserted against non-fiduciaries such as L & W and Levin, have been held preempted by ERISA. *See Elmore v. Cone Mills Corp.,* 23 F.3d 855, 863 (4th Cir.1994) (state law breach of fiduciary duty claim against defendants for acts arising before they were ERISA fiduciaries "clearly 'relates to' an ERISA-covered plan" and is preempted); *Toomey v. Jones,* 855 F.Supp. 19, 27 (D.Mass.1994) ("a person or professional organization [providing administrative and consulting services for an ERISA plan] is not subject to common law claims for rendering services relating to an ERISA plan."); *Nealy v. U.S. Healthcare HMO,* 844 F.Supp. 966, 974 (S.D.N.Y.1994) (breach of fiduciary duty claim against plan provider is preempted "because the civil enforcement provision of ERISA provides a specific remedy for breach of fiduciary duty once it is found that a plan is covered by ERISA").

Finally, if L & W and Levin were actually deemed to be ERISA fiduciaries, as the Complaint alleges (Complaint ¶ 719), any claim for breach of fiduciary duty would then be actionable under ERISA's own breach of fiduciary duty provision, 29 U.S.C. § 1109, and any common law breach of fiduciary duty claim would be preempted. *See Clark v. Bank of New York,* 801 F.Supp. 1182, 1194 (S.D.N.Y.1992); *Metzner v. D.H. Blair & Co.,* 663 F.Supp. 716, 722 (S.D.N.Y.1987). As the Honorable Sonia Sotomayor recently held:

> [Plaintiff's claim for] breach of fiduciary is clearly preempted by ERISA. Breach of fiduciary duty is necessarily an ERISA claim. There can be no fiduciary duty unless defendants are found to be fiduciaries of the Plan. If defendants are non-fiduciaries, they may owe a common law duty of care to plaintiffs, but not a fiduciary duty.

*Pedre Co., Inc. v. Robins,* 901 F.Supp. 660, 665 (S.D.N.Y.1995).

The Funds contend that the their Sixty-eighth claim is one for professional malfeasance, and, as such, is not preempted by ERISA. In substance, however, plaintiffs' Sixty-eighth Claim is one for breach of fiduciary duty. Thus, the authorities upon which the Funds rely, which establish that professional malpractice claims are not preempted, are not relevant to the Funds' Sixty-eighth claim.

For example, in *Carpenters' Local Union No. 964 Pension Fund v. Granik Silverman,* No. 93 Civ. 8787, 1995 WL 378539 (S.D.N.Y. June 22, 1995), no breach of fiduciary duty claim was asserted, and the Court therefore did not address whether a common law breach of fiduciary duty claim would be preempted by ERISA. Thus, the Court's holding that breach of contract and professional malpractice claims are not preempted by ERISA is inapplicable here.

As set forth above, the determining factor in the preemption analysis is whether ERISA provides a remedy for the conduct at issue. Here, ERISA provides a remedy for the conduct upon which the Funds base their common law breach of fiduciary duty claim. Accordingly, the Levin Defendants' Motion to dismiss Plaintiff's Sixty-eighth claim will be granted, and the Funds' motion for summary judgment with respect to that claim will be denied.

## IV. *The ERISA Cause of Action*

The Levin Defendants seek to dismiss the ERISA claims on the grounds that: (i) the Trust Funds lack standing to sue them for breach of fiduciary duty; (ii) the Levin Defendants do not satisfy the statutory definition of an ERISA fiduciary; and (iii) the claims are time-barred.

### A. *Standing*

█ The contention that the Funds lack standing to bring this action lacks merits because this action was commenced by the Board of Trustees of the Funds, who have standing under ERISA to bring fiduciary breach claims. See 29 U.S.C. § 1132(e). Moreover, in October, 1996, the Funds amended the Complaint to add the Trustees as plaintiffs, thereby curing any standing defect that may have existed in the Funds' first Complaint, filed in 1995.

### B. *Fiduciary Status*

█ ERISA defines a fiduciary as a person who exercises discretionary authority or discretionary control respecting management of a plan or its assets, or who renders investment advice for a fee, or who has authority or responsibility to do so. 29 U.S.C. § 1002(21)(A). Unlike the common law definition under which fiduciary status is determined by virtue of the position a person holds, ERISA's definition is functional. *See Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262, 113 S.Ct. 2063, 2071–72, 124 L.Ed.2d 161 (1993); *Blatt v. Marshall & Lassman*, 812 F.2d 810, 812 (2d Cir.1987). Thus, while attorneys to a plan are not ordinarily viewed as ERISA fiduciaries if they merely provide ordinary professional advice, they may nevertheless become liable under ERISA when they "cross the line" by exercising discretionary authority or control. *Mertens*, 508 U.S. at 262, 113 S.Ct. at 2071–72.

Attorneys may be viewed as exercising discretionary authority or control within the meaning of Section 3(14) of ERISA even when acting in an advisory capacity. According to the legislative history of the statute:

While the ordinary functions of consultants and advisers to employee benefit plans ... may not be considered as fiduciary functions, it must be recognized that there will be situations where such consultants and advisers may because of their special expertise, in effect, be exercising discretionary authority or control with respect to the management or administration of such plan or some authority or control regarding its assets. In such cases, they are to be regarded as having assumed fiduciary obligations within the meaning of the applicable definition.

H.R.Rep. No. 1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 5038, 5103; *see also Reich v. Lancaster*, 55 F.3d 1034 (5th Cir.1995) (fund's insurance agent deemed to be fiduciary where trustee, who had no insurance experience or expertise, accepted every recommendation made by agent); *Reich v. McManus*, 883 F.Supp. 1144 (N.D.Ill.1995) (denying summary judgment because insurance broker's status as ERISA fiduciary could be established based on evidence that trustees relied exclusively on his advice); *Stanton v. Shearson Lehman/American Express, Inc.*, 631 F.Supp. 100, 103 (N.D.Ga.1986) (professional may have fiduciary status if trustees merely "rubber stamp[ed]" his recommendations)

This Court recently denied a motion to dismiss breach of fiduciary duty claims asserted against attorneys involved in the approval and consummation of ERISA fund real estate transactions, in light of allegations that they:

represented to the Fund that they possessed, and held themselves out as possessing, special expertise in ... the provisions of law governing multi-employer pension trust funds, including ERISA, ...; that the defendants knew the transactions were imprudent or prohibited; that the trustees relied on the defendants' expertise ...; and that by failing to advise the trustees on the unsuitability or prohibited nature of the investments, the defendants failed to prevent the transactions.

*Carpenters' Local Union No. 964 Pension Fund v. Granik Silverman*, No. 93 Civ. 8787(RPP), 1995 WL 378539, at *7 (S.D.N.Y. June 26, 1995). The court concluded that,

"under a broad reading of the plaintiffs' allegations, the defendants may have exercised effective control over the Funds' assets by virtue of their input respecting the Funds' investments."

Here, under the broad reading of Plaintiffs' allegations appropriate at this juncture, the Levin Defendants may have exercised effective control over the Funds' assets by virtue of the role they played in the decision-making process. The Minutes reveal that Levin was actively involved in most or all aspects of the decision-making process, both in his capacity as Funds' counsel and as a member of the Funds' Investment Committee. A number of Trustees, including Michael Pagano and Frank Lupo, have testified to their reliance on Levin in making determinations concerning the conduct of the Funds' affairs. *See United States v. Mason Tenders District Council,* 909 F.Supp. 882, 888 (S.D.N.Y.1995) (former Fund Trustee conducted no independent inquiry, relying upon counsel for advice on propriety of real estate transactions).

Finally, Levin's membership on the Funds' investment committee may support an inference that Levin functioned as a fiduciary as defined by ERISA. The legislative history of the statute confirms that "fiduciaries include officers and directors of a plan, members of a plan's investment committee and persons who select these individuals." H.R.Rep. No. 1280, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin. News 5038, 5103.

The Funds have stated a claim for an ERISA violation based on the allegations that the Levin Defendants acted in a fiduciary capacity in connection with the various transactions for which the Trustees are seeking to recover damages.

## C. *The Statute of Limitations*

The Levin Defendants contend that because former Trustees of the Funds might have been aware of some of the facts giving rise to the Funds' claims more than three years before the Complaint was filed, those claims are time-barred.

ERISA's three-year statute of limitations for breach of fiduciary duty claims is conditioned on a showing of "actual knowledge" by the plaintiffs. *See* 29 U.S.C. § 1113(1)(A) & (2). The Levin Defendants must therefore demonstrate that all of the facts material to the claims asserted against them were known more than three years prior to the time the Complaint was filed. *See Brock v. Nellis,* 809 F.2d 753, 755 (11th Cir.1987) (to charge the plaintiff with actual knowledge, it is not enough that he had notice of something awry); *Benvenuto v. Taubman,* 690 F.Supp. 149, 153 (E.D.N.Y.1988) ("the knowledge necessary to trigger the three-year period is not mere knowledge of the activity later claimed to be fraudulent, nor speculation that 'something is awry' but 'specific knowledge of the actual breach of duty upon which [plaintiff later] sues.' ") (citations omitted).

Actual knowledge is measured from the standpoint of the trustees who commenced the lawsuit and cannot be attributed to them by the knowledge of prior trustees or other current trustees. In *Crimi v. PAS Industries, Inc.,* No. 93 Civ. 6394(RPP), 1995 WL 272580, at *3 (S.D.N.Y. May 9, 1995), for example, this Court denied a motion to dismiss ERISA claims on statute of limitations grounds, notwithstanding the fact that one of the Trustees had signed the release of guarantees that gave rise to the claims. The court stated:

Most consonant with the language of the statute and the purposes of ERISA is the interpretation that any trustee who sues as plaintiff and does not have actual knowledge of the relevant facts sufficient to make an ERISA claim may avail himself of the six year limitations period.... Since each trustee has an obligation to protect the plan assets, each has an obligation to seek enforcement and to be such a plaintiff where necessary. Because the enforcement statute allows any fiduciary to sue, it would be inconsistent to provide a shorter limitations period for a plaintiff trustee due to the actual knowledge of another trustee, whether or not a co-plaintiff.

*Crimi,* 1995 WL 272580, at *3.

Similarly, in *New York State Teamsters Council Health & Hosp. Fund v. Estate of*

*DePerno,* 816 F.Supp. 138 (N.D.N.Y.1993), *aff'd in relevant part,* 18 F.3d 179 (2d Cir. 1994), the court denied a motion to dismiss a breach of fiduciary duty claim on statute of limitations grounds, even though the fund administrator and one of the trustees had actual knowledge of the alleged breach more than three years before the action was commenced. The court held that knowledge of the administrator and trustee did not impart "actual knowledge" to the entire Board of Trustees. 816 F.Supp. at 144. *See also Board of Trustees, Sheet Metal Workers Pension Trust v. Smith Heating & Air Conditioning, Inc.,* No. C–92–4026, 1993 WL 84539, at *9 (N.D.Cal. Mar. 15, 1993) (rejecting argument that one trustee's knowledge should be imputed to the entire trust).

Three of the four Trustees who authorized this lawsuit had been Trustees for less than three years as of the time the Complaint was filed, and the fourth Trustee, Paul O'Brien, has attested that he had no specific knowledge of the Levin Defendants' activities in connection with these transactions.

The *Newsday* article of July 21, 1991, which discussed certain of the transactions giving rise to this litigation, is irrelevant, as it contains no specific mention of the Levin Defendants' involvement or culpability. This Court already observed in the Government's case that "[t]he most that can be inferred from the *Newsday* article is that the United States Department of Labor was alert to the need to conduct an investigation into the transactions. The article does not support an inference that [the Government] had actual knowledge of ERISA violations more than three years prior to filing suit." *United States v. Mason Tenders' District Council,* 909 F.Supp. 882, 891 (S.D.N.Y.1995). Likewise, the indictment of Frank Lupo and two other individuals in September 1992 is not evidence that any Trustees learned of the indictment or its contents, let alone its relationship to claims against the Levin Defendants.

Accordingly, there is no basis for dismissing the ERISA claims asserted against the Levin Defendants.

## V. *The RICO Cause of Action*

Defendants contend that Plaintiffs' RICO claim is insufficient in light of the Supreme Court's decision in *Reves v. Ernst & Young,* 507 U.S. 170, 184, 113 S.Ct. 1163, 1172–73, 122 L.Ed.2d 525 (1993), which requires a defendant to participate in the operation or management of the enterprise in order to be held liable under RICO. Plaintiffs contend that they have satisfied *Reves,* and point to language in *Reves* indicating that its operation-or-management test can be satisfied where individuals associated with an enterprise "exert control over it as, for example, by bribery." According to Plaintiffs, the Levin Defendants' payment of kickbacks, under the circumstances alleged in the Complaint, constitutes sufficient participation in, and control over, the RICO enterprise to trigger a violation of the statute under *Reves.*

Plaintiffs rely on various post-Reves decisions in which the payment of bribes was held to be sufficient to establish the defendant's management or operation of the enterprise. However, the cases relied upon by Plaintiffs are distinguishable from the instant case in that those cases each involve the use of bribery to corrupt and induce criminal activity by an otherwise legitimate organization, indeed a law enforcement office or court of law. *See United States v. Yonan,* 800 F.2d 164, 165 (7th Cir.1986) (defendant charged with bribery of an Assistant State's Attorney "in order to influence the disposition of some of Yonan's cases"); *United States v. Blackwood,* 768 F.2d 131 (7th Cir. 1985) (police officer stationed at Traffic Court building charged with "promis[ing] to influence judicial decisions by passing bribes on to judges in the Traffic Court"); *United States v. Lee Stoller Enterprises, Inc.,* 652 F.2d 1313 (7th Cir.1981) (upholding claim that Sheriff's Office was corrupted by bribes paid to the sheriff and deputy sheriff in a towing and prostitution payoff scheme); *United States v. Bright,* 630 F.2d 804, 831 (5th Cir.1980) (same); *United States v. Forsythe,* 560 F.2d 1127 (3rd Cir.1977) (upholding charge that systematic money payments were made to various magistrates and constables involved in the county criminal justice system).

■ By determining the outcome of a judicial proceeding, the RICO Defendants in the cases cited above may be seen as participating in the management of, and exerting control over, the organization that they have corrupted. Accordingly, the above-cited decisions are consistent with the *Reves* decision. By contrast, the bribes paid by the Levin defendants cannot be deemed an exertion of control over the Funds, as the bribes only influenced the decision of which law firm the Funds would use. The Complaint here alleges that the Levin Defendants paid bribes to Fund officials to influence their decisions regarding the selection of the Funds' counsel, and that the purpose of the Levin payments was "to ensure the continued use of the law firm of L & W to perform legal services for the Trust Fund and its beneficiaries." Complaint, I 683. Such a limited influence over the decisions and functioning of an enterprise is not sufficient to satisfy *Reves*.

In a recent case closely resembling the facts at hand, the Honorable Charles S. Haight, Jr. dismissed plaintiff's bribery-based RICO claims, holding there was insufficient support for the claim that a group of defendants (the "Werner Krebs defendants"), accused of paying $590,000 in bribes for the purpose of inducing the award of contracts to them, exercised control over the RICO enterprise ("FMG"). *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Young*, 1996 WL 383135 (S.D.N.Y., July 9, 1996). The Court held that it was the recipients ("Young, Serino and Fraser") who appeared to be conducting and managing the enterprise, not the payors.

The Court concluded:

The Amended Complaint includes several conclusory assertions that the defendants were "conducting" the two alleged enterprises, ¶¶ 101–04, but it makes no factual allegations in support of those statements. Plaintiffs plead no facts which indicate that the Werner Krebs defendants controlled or directed the FMG. Rather, the Amended Complaint alleges that the Werner Krebs defendants made their bribe payments "to influence Young, Serino and Fraser in the conduct of Merrill Lynch's affairs and the operation of the Facilities Management Group.... " ¶ 113. This statement clearly implies that control lay outside the hands of the Werner Krebs defendants, who sought to influence those who were in control.

Plaintiffs' attempt to save the Amended Complaint by reference to the *Reves* Court's explicit extension of the scope of § 1962(c) beyond an enterprise's "insiders." *Reves*, 507 U.S. at 185, 113 S.Ct. at 1173. *Reves* holds that "[a]n enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Id.* at 184, 113 S.Ct. at 1172. Plaintiffs contend that their allegation that the Werner Krebs defendants paid Young, Serino and Fraser over $590,000 in bribes sufficiently establishes that the Werner Krebs defendants participated in directing FMG.

I cannot accept that contention. The Amended Complaint simply does not allege facts that support a theory that the Werner Krebs defendants controlled the FMG. If anything, the Complaint paints a picture of Werner Krebs (and all the other outside defendants) vying for the attention of the employee defendants, who parceled out the contracts to the highest bidders. The Amended Complaint repeats time and again with reference to all of the defendants, that they paid bribes to Young, Serino and Fraser for the purpose of inducing them to award contracts to them. *See, e.g.,* ¶¶ 73, 63–73, 107–13. 143–47. Plaintiffs would have the Court believe that these payments by the numerous defendants gave each defendant a controlling interest in the FMG.

But where plaintiffs see allegations of control, by many, I see an allegation of control by three. I read the Complaint to allege that Young, Serino and Fraser used the FMG to elicit bribes from contractors in exchange for valuable contracts. There are no factual allegations to support the claim that the Werner Krebs defendants controlled the FMG. Defendants' motion to dismiss is granted as to the legitimate FMG enterprise.

Following Judge Haight's well-reasoned recent opinion, the Court finds that the "bribery" alleged of L & W and Levin do not reflect the exertion of "control" envisioned by *Reves* in its mention of bribery.

## VI. The Plaintiffs Are Not "Equitably Estopped" from Asserting Claims Against the Levin Defendants

The Levin Defendants contend that, by virtue of the Government's settlement of certain civil and criminal charges against Roger Levin, the Funds are precluded from pursuing their civil RICO and ERISA claims against them. Although the Court will dismiss the Funds' RICO claims for independent reasons as set forth above, the Court will address the Levin Defendants' estoppel argument as it relates to the Funds' ERISA claim.

The Levin Defendants largely rely on the principle of virtual representation, which provides that a non-party may be bound by a judgment if one of the parties to the suit "is so closely aligned with his interests as to be his virtual representative." *See, e.g., Aerojet–General Corp. v. Askew,* 511 F.2d 710, 719 (5th Cir.1975).

Generally, "virtual representation requires either some form of agreement by the non-party to permit the litigant in the first suit to represent him ... or else a relationship between them that demonstrates that the litigant was authorized to represent and was in fact representing the legal interest of the non-party." *Algie v. RCA Global Communications, Inc.,* 891 F.Supp. 839, 853–54 (S.D.N.Y.1994), *aff'd,* 60 F.3d 956 (2d Cir. 1995). *See* also Restatement (Second) of Judgments, § 41(1) (virtual representation applies when the non-party is represented by a party who is (i) the trustee of an estate; (ii) invested with authority to represent him; (iii) executor, administrator or similar fiduciary; (iv) an official or agency invested by law with authority to represent the person's interest; or (v) a class representative).

The doctrine of virtual representation thus constitutes an exception to the basic rule that non-parties to an action are not bound by the outcome of that action. *See* 18 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4449, at 411 (1981) ("The basic premise of preclusion is that parties to a prior action are bound and non-parties are not bound.").

The specific question presented here is whether the Government's ERISA action can serve to preclude private litigants from bringing an ERISA action. While it is true that "[p]rivate litigation may be precluded by public action," this is only true where private litigants are pursuing public interests. *See* 18 Wright, Miller & Cooper, *Federal Practice and Procedure: Jurisdiction* § 4458, at 521. "In most circumstances, however, it should be presumed that public enforcement actions are not intended to foreclose traditional common law claims or private remedies expressly created by statute." *Id.* at 515. *See also Antrim Mining, Inc. v. Davis,* 775 F.Supp. 165, 170 (M.D.Pa.1991) ("Courts applying the doctrine of virtual representation have not held the Government and private citizens to be in privity.").

Here, the Funds seek not to protect the "public interest" but to recover on behalf of their participants for the losses suffered at the hands of the Levin Defendants. Accordingly, the narrow circumstances outlined above are not present here.

Moreover, as Wright and Miller have observed, in determining whether a private action is precluded by a government action, "a great deal turns on measuring the importance of individual enforcement rights." *Id.* at 514. Thus, the Supreme Court has noted that "a person whose private interests coincide with the public interest in government antitrust litigation is nonetheless not bound by the eventuality of such litigation." *Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961).

Here, the Government's prior suit and the alignment of interests between the Funds and the Government is not sufficient to bar the Funds' pursuit of the explicit private enforcement provisions of ERISA. *See Algie,* 891 F.Supp. 839, 856 ("plaintiffs have a due process right to litigate all issues once, and if they did not participate or were not represented in [the prior action], they must be permitted to be heard here."). *See also*

*Phillips v. Kidder, Peabody & Co.*, 750 F.Supp. 603, 606 (S.D.N.Y.1990) (under due process, doctrine . of virtual representation applies only if the relationship between the parties is sufficiently close).

The Funds did not authorize the Government to negotiate Roger Levin's plea bargain; indeed, there is no evidence that they were even aware of the Government's negotiations with Roger Levin. The Funds were not in privity with the Government, nor did they control the Government's conduct of the litigation. Indeed, the Funds were defendants in that action.

In short, the Funds cannot, consistent with constitutional due process principles, be bound by a settlement agreement negotiated without their consent or authorization. Accordingly, the Levin Defendants' motion to dismiss the ERISA claims on estoppel grounds will be denied.

## VII. *Malpractice Claims*

The Levin Defendants seek dismissal of the Funds' malpractice claims on the grounds that those claims are time-barred, and that the Funds have not properly alleged causation.

The Albanese Defendants seek dismissal of the malpractice claims against them, alleging that they were not counsel to the Funds and that the malpractice.claims against them are time-barred.

The Cunningham Defendants seek dismissal of all but one of the malpractice claims against them as time-barred.

### A. *Statute of Limitations*

#### 1. *The 1996 Amendment*

■ A recent enactment of the New York State Legislature provides that the statute of limitations for claims of professional malpractice is three years, regardless of the theory asserted. N.Y. Civ. Prac. Law & Rules § 214(6) (the "1996 Amendment"). The Levin Defendants contend that the 1996 Amendment requires dismissal of the Funds' real estate-based malpractice claims against Levin and L & W, and limits the scope of the Funds' "omnibus" legal malpractice claim (74th Claim).

The statute of limitations for claims of non-medical professional malpractice is prescribed by CPLR § 214(6), which until recently read as follows:

> The following actions must be commenced within three years:
>
> \* \* \* \*
>
> 6. an action to recover damages for malpractice, other than medical, dental or podiatric malpractice ...

New York courts, however, by analogizing malpractice suits by clients against professionals to breach of contract actions, began to allow malpractice claims to be governed by a six-year statute of limitations. CPLR § 213(2). The effect of this trend was to expand the six-year statute of limitations beyond the type of action in which that contract-based limitations period had been recognized, *i.e.*, actions in which the professional had contracted to produce a specified result. *See, e.g., Glens Falls Insurance Company v. Reynolds*, 3 A.D.2d 686, 159 N.Y.S.2d 95, 97 (3d Dep't 1957) (three-year statute for negligence applies to claim against attorney for "carelessness resulting in professional miscarriage"; where attorney agreed to obtain specific result, or to assure a specific result, six-year statute might apply).

In *Santulli v. Englert, Reilly & McHugh, P.C.*, 78 N.Y.2d 700, 579 N.Y.S.2d 324, 586 N.E.2d 1014 (1992), the Court of Appeals held that where a client sued its former lawyer for professional malpractice, a six-year statute should apply since the plaintiff was actually seeking a remedy for a breach of the lawyer's implied promise to exercise due care in providing legal services.

■ In response to Santulli and its predecessors, the Legislature recently passed a bill providing that CPLR § 214(6) would henceforth read as follows:

> 6. an action to recover damages for malpractice, other than medical, dental or podiatric malpractice, regardless of whether the underlying theory is based in contract or tort ...

The last phrase was recently added, and clarifies that all actions for malpractice against non-medical professionals are to be

governed by a three-year limitations period. The 1996 Amendment, which provided that it "shall take effect immediately," was signed by the Governor on September 4, 1996.

The instant action was filed in November 1995, prior to the passage of the 1996 Amendment. The Levin Defendants contend that the 1996 Amendment should be applied to all pending actions, including those filed prior to the 1996 Amendment. The Funds contend that such an application would be improperly retroactive.

This Court is aware of only a few cases which were decided after the 1996 Amendment and which address the applicability of the 1996 Amendment to pending cases. In *Ruffolo v. Garbarini & Scher, P.C.*, No. 105819/96 (Sup.Ct., N.Y.Cty. Sept. 18, 1996), the Court applied the three-year statute of limitations set forth in CPLR § 214(6) to a claim that was pending prior to the 1996 Amendment, and held that plaintiff's legal malpractice claim, filed more than three years after the claim had accrued, was time-barred. In *Russo v. Waller*, 655 N.Y.S.2d 313 (Nassau Cty Sup.Ct.1997), the New York State Supreme Court also applied the 1996 Amendment to pending cases, holding that the statute's remedial nature made retroactive application appropriate. *But see Garcia v. Jonathan Director*, N.Y.L.J. (N.Y.Cty.Sup. Ct. Jan. 17, 1997) (holding that 1996 Amendment was not intended to be applied retroactively).

The only appellate courts to address this issue, however, have held that the 1996 Amendment was not intended to be applied retroactively. In *Unadilla Silo Co., Inc. v. Ernst & Young*, 651 N.Y.S.2d 216, 218, n. 2 (3d Dep't 1996), the Third Department noted the 1996 Amendment in a footnote, but applied the six-year statute of limitations, citing *Santulli*. The Court did not address the retroactivity of the 1996 Amendment, but implicitly rejected the propriety of retroactive application.

Finally, in *Board of Managers of the Ocean Club at Long Beach Condominium v. Mandel*, 652 N.Y.S.2d 301 (2d Dep' t 1997), the Second Department held that "[t]he six-year Statute of Limitations ... applies in this case based upon the defendant' s alleged malpractice." *See* id. at 302 (internal citations omitted). The Court also held, without further elaboration, that "the recent amendment to CPLR 214(6) effective September 4, 1996 (L 1996, ch. 623), making an action to recover damages for malpractice (other than medical, dental or podiatric malpractice) subject to a three-year statute of limitations, regardless of whether the underlying theory is based in contract or tort, is not applicable to this case." The language and context of this holding makes it clear that, in the Second Department's view, the 1996 Amendment is not applicable to cases pending prior to its September 1996 effective date.

In light of the Second and Third Departments' recent decisions, the six-year statute of limitations will be applied to the Funds' malpractice claims against the Levin and Cunningham Defendants.

Only one of the Funds' malpractice claims against the Levin Defendants—the claim arising from the 1987 Indian Creek purchase—arose out of a transaction that occurred more than six years prior to the filing of the Complaint in this action in November 1995. The Funds' remaining malpractice claims against the Levin Defendants were timely filed within the applicable six-year statute of limitations and will not be dismissed. Accordingly, the claim against the Levin Defendants arising out of the Indian Creek property will be dismissed as time-barred.

The Albanese Defendants' motion for summary judgment based on the retroactivity of the 1996 Amendment will not be addressed, as that motion will be granted based on alternative grounds, as set forth below.

The Cunningham Defendants claim that even if the Court determines that the 1996 Amendment should not be applied retroactively, the malpractice claims against them are time-barred because they were only added as defendants on September 25, 1996, after the 1996 Amendment was made into law on September 4, 1996.

Under Second Circuit law, which determines when this action was commenced

for statute of limitations purposes,[3] "the filing of a motion to amend constitutes commencement of an action. When a plaintiff seeks to add a new defendant in an existing action, the date of the filing of the motion to amend constitutes the date the action was commenced for statute of limitations purposes." *Northwestern Nat'l Ins. Co. v. Alberts*, 769 F.Supp. 498, 510 (S.D.N.Y.1991) (emphasis in original) (citing *Derdiarian v. Futterman Corp.*, 36 F.R.D. 192, 194 (S.D.N.Y.1964)). Pursuant to this doctrine, the action against the Cunningham Defendants was filed on August 21, 1996, when the Funds motion to amend to add the Cunningham Defendants was filed.

Accordingly, the retroactivity analysis set forth above applies equally to the Funds' malpractice claims against the Cunningham Defendants. Under the applicable six-year statute of limitations, two of those claims are time-barred—the claim arising out of the Indian Creek purchase which took place in 1987, and the claim arising out of the purchase of the Brooklyn Properties in 1989 and early 1990. The remainder of the Funds' legal malpractice claims against the Cunningham Defendants arise out of transactions that occurred less than six years prior to the filing of the motion to amend in August 1996 and accordingly are timely.

### 2. *Continuous Representation Doctrine*

The Funds contend that even the claims arising from transactions that occurred more than six years prior to the filing of the Complaint, and, in the case of the Cunningham Defendants, the Amended Complaint, are timely, as those claims did not accrue until 1994 and 1995, when the Levin and Cunningham Defendants' representation of the Funds was terminated.

■ In New York, the "continuous representation doctrine" provides that the statute of limitations for a legal malpractice action

runs from the end of the attorney's representation of the client in connection with the matter giving rise to the malpractice claim. *See, e.g., Glamm v. Allen*, 57 N.Y.2d 87, 94, 439 N.E.2d 390, 393, 453 N.Y.S.2d 674, 677–78 (1982). The Funds claim that: (1) the Levin Defendants' continuous representation of the Funds tolled the statute of limitations on all the Funds' malpractice claims against the Levin Defendants, including the claim based on the 1987 Indian Creek transaction, until L & W's resignation in October 1994; and (2) the Cunningham Defendants' continuous representation of the Funds tolled the statute of limitations on all the Funds' malpractice claims against the Cunningham Defendants, including the claim based on the 1987 Indian Creek transaction and the claim based on the Brooklyn Properties purchase in 1989 and early 1990, until C & L's resignation in 1995.

The continuous representation doctrine is premised on the trust relationship between the attorney and the client, and the inequity of barring the client from suing the attorney based on the running of the statute of limitations during the life of that relationship. *See Lazzaro v. Kelly*, 87 A.D.2d 975, 450 N.Y.S.2d 102, 104 (App.Div. 4th Dep't 1982), *aff'd*, 57 N.Y.2d 630, 454 N.Y.S.2d 59, 439 N.E.2d 868 (1982); *Farrauto, Berman, Fontana & Selznick v. Keowongwan*, 166 Misc.2d 804, 634 N.Y.S.2d 346, 348 (City Ct. of Yonkers 1995) ("doctrine . . . envisions a relationship between the parties that is marked with trust and confidence"). As Judge Leisure recently observed, "a client's trust in his attorney necessarily hinders that client's ability to question his attorney's actions." *Warney v. McMahon Martine & Gallagher*, No. 95 Civ. 7064, 1996 WL 339997, at \*4 (S.D.N.Y. June 19, 1996) (Leisure, J.).

### a. *The Levin Defendants*

■ The Funds argue that their continuous representation by the Levin Defendants

---

**3.** *See, e.g., Broomes v. Schmidt*, 1996 WL 229369, at \*3–\*4 (E.D.Pa. May 3, 1996) ("when an action has been commenced in federal court is a procedural question governed by federal law"). The Cunningham Defendants rely on a Second Circuit decision, *Personis v. Oiler*, 889 F.2d 424, 426 (2d Cir.1989), for the proposition that, in diversity cases, state law determines when an action was commenced. In *Personis*, however, the Second Circuit held only that "where no federal rule had displaced state tolling statutes either expressly or by fair implication, federal courts [a]re required to follow the relevant state procedures governing service of process." *Id.* (citing *Walker v. Armco Steel Corp.*, 446 U.S. 740, 100 S.Ct. 1978, 64 L.Ed.2d 659 (1980)). The limited holding of *Personis* does not apply to the facts of the instant action.

over the course of some forty years gave rise to a trust relationship that both encompassed and transcended the particular transactions giving rise to this lawsuit. According to the Funds, it is irrelevant whether the particular transactions at issue concluded in 1987, or whether information concerning these transactions came to light in 1992. The Funds contend that while the representation was continuing, the Trustees could not have been expected to evaluate this information from the perspective of potential claims against the Levin Defendants. Indeed, the mere presence of the Levin Defendants at Fund meetings would have inhibited any such consideration. *See Warney*, 1996 WL 339997, at *5 ("when the formal attorney-client relationship is severed, the tolling of the statute of limitations ceases"); *Spencer v. Cohen*, 886 F.Supp. 235, 238 (N.D.N.Y.1995) (statute of limitations for malpractice was tolled until attorney's representation of plaintiff ended).

The Fund' s broad reading of the continuous representation doctrine is not consistent with New York case law. While numerous cases refer to trust relationship between client and attorney as the rationale underlying this doctrine, New York Courts have repeatedly held that the doctrine is strictly limited to instances where the continuing representation pertains specifically to the matter in dispute, and is not applicable where an attorney provides ongoing general representation. *See, e.g., Tal–Spons Corp. v. Nurnberg*, 213 A.D.2d 395, 397, 623 N.Y.S.2d 604, 605 (2d Dep't 1995) (attorney's "continued consultation" with plaintiff and new counsel "cannot be equated with ongoing representation"); *Albany Savings Bank, F.S.B. v. Caffry, Pontiff, Stewart, Rhodes & Judge, P.C.*, 95 A.D.2d 918, 463 N.Y.S.2d 896, 897 (3rd Dep't 1983) (holding continuous representation did not toll statute of limitations where continuing professional relationship included attorney's participation in mortgage foreclosure action but was independent of events giving rise to malpractice claim, *i.e.*, the examination of title); *Lazzaro v. Kelly*, 87 A.D.2d 975, 450 N.Y.S.2d 102 (4th Dep' t 1982) (attorney' s continued service as escrow agent does not establish continuous representation, as no trust relationship existed).

In order to invoke the continuous representation doctrine, a plaintiff must affirmatively demonstrate ongoing representation in connection the specific matter from which the malpractice claim arose. *See Zaref v. Berk & Michaels*, 192 A.D.2d 346, 595 N.Y.S.2d 772 (1st Dep't 1993) (holding malpractice claim barred by statute of limitations and continuous representation doctrine not applicable where plaintiffs "failed to describe any specific acts performed, representations made and/or omissions by defendants concerning the particular transactions which are challenged herein."). Moreover, that demonstration must be made with "clear indicia of an ongoing, continuous, developing and dependent relationship between the client and. the attorney." *Luk. Lamellen U. Kupplungbau v. Lerner*, 166 A.D.2d 505, 506, 560 N.Y.S.2d 787, 789 (2d Dep't 1990).

The Funds have not made a showing adequate to warrant application of the continuous representation doctrine and toll the statute of limitations for the Indian Creek claim until October 1994, when the Levin Defendants terminated their relationship with the Funds. Accordingly, the Funds' malpractice claim against the Levin Defendants arising from the Indian Creek purchase will be dismissed as time-barred.

### b. *The Cunningham Defendants*

The Funds contend that their malpractice claims against the Cunningham Defendants arising out of the Indian Creek and Brooklyn property purchases are timely under the continuous representation doctrine. However, in support of this contention, the Funds have failed to offer specific allegations to support the Cunningham Defendants' continued representation by the Funds in connection with the specific transactions at issue, as required under New York law.

The Funds allege that the Cunningham Defendants regularly reported to the Trustees regarding these two transactions in the years following the transactions, but point to only one Trustees meeting that occurred after August 1990—the cut-off date for accrual of the malpractice claims alleged in the amended complaint—at which Cunningham reported on an offer to purchase the Indian Creek property. The Funds point to no

specific minutes of Trustee Meetings that are alleged to support the Cunningham Defendants' continuous representation of the Funds in connection with the purchase of the Brooklyn Properties.

Under New York law, the Funds have failed to demonstrate evidence of continuous representation sufficient to defeat the Cunningham Defendants' motion for summary judgment. In *Albany Savings Bank,* 463 N.Y.S.2d at 897, the Third Department held that an attorney's earlier representation in connection with a title examination was not sufficiently intertwined with the attorney's representation in a related mortgage foreclosure action to warrant tolling of the statute of limitations under this doctrine.

■ Likewise, here, Cunningham's representation of the Funds in connection with the 1994 sale of the Indian Creek property and the earlier renovations of that property are insufficient to warrant tolling of the statute of limitations here with respect to the malpractice claim arising out of the purchase of that property in 1987. Moreover, the Funds' broad allegation that all the real estate transactions were part of an ongoing scheme to defraud the Trustees is itself insufficient to warrant application of the continuous representation doctrine, in the absence of more specific allegations that the matters which gave rise to the claim were ongoing matters in which the Funds were represented by the Cunningham Defendants.

Accordingly, the Funds' legal malpractice claims against the Cunningham Defendants arising from the purchase of the Indian Creek and Brooklyn Properties will be dismissed.

## B. *Causation*

■ The Levin Defendants contend that the Funds have not properly alleged causation in connection with their legal malpractice claims. The Funds' malpractice claims which are not time-barred are those arising from the purchases of the Brooklyn Properties and the 18th Street Property. With respect to these properties, the Funds allege that a contractual relationship existed between the Funds and the Levin Defendants, pursuant to which L & W and Levin had a duty to represent the Funds with the reasonable care, skill and diligence possessed and exercised by the ordinary attorney in similar circumstances.

The Funds claim that L & W and Levin should have known that the purchase price for each of the properties was "grossly inflated," and that they breached their duty to advise the Funds of this. The Funds further allege that they were injured as a result of L & W's and Levin's breach of their duty to exercise reasonable care, and that L & W and Levin knew or should have known that the Funds should have retained a Qualified Professional Asset Manager ("QPAM") in connection with the transactions and had a duty so to advise the Funds. Their failure to do so, plaintiffs allege, resulted in injury to the Funds.

In order to properly allege causation, the Funds must show that but for the purported negligence of L & W and Levin, they would have avoided the injuries that they allege resulted from the real estate transactions. According to the Levin Defendants, the Funds have not made the causation showing required under New York law. *See, e.g., Stroock & Stroock & Lavan v. Beltramini,* 157 A.D.2d 590, 591, 550 N.Y.S.2d 337, 338 (1st Dep't 1990).

It cannot be said at this juncture that the Funds have failed to state a claim for malpractice as a matter of law. The Funds may be able to demonstrate after discovery that the alleged malpractice indeed injured the Funds. The allegations with respect to the real estate transactions, the general allegations concerning the central role of the Levin Defendants in the conduct of Fund affairs, and the possibility that their acquiescence in wrongdoing was purchased through their lucrative fee-for-kickback scheme are sufficient to allege that the transactions would not have been consummated without the Levin Defendants' acquiescence.

## C. *No question of Fact Exists as to Whether the Albanese Defendants Had an Attorney-client Relationship with the Funds*

■ An essential element of the Funds' malpractice claims against the Alba-

nese Defendants is an attorney-client relationship between those Defendants and the Funds. According to the Albanese Defendants, they served as counsel only to Anthony Zotollo, in his capacity as a Fund trustee.

An attorney may not be held liable for negligence in the provision of professional services adversely affecting one with whom the attorney is not in contractual privity. *See, e.g., National Westminster Bank USA v. Weksel,* 124 A.D.2d 144, 146, 511 N.Y.S.2d 626, 628 (1st Dep't 1987); *Compusort, Inc. v. Goldberg,* 606 F.Supp. 456, 457 (S.D.N.Y. 1985).

This privity requirement is based upon basic ethical considerations. "A primary reason for refusing to expand privity is to avoid a potential conflict since the interests of the attorney's client ... may not be harmonious with other persons...." 4 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 31.4 (4th ed.1996) (citations omitted).

 To establish the existence of an attorney-client relationship, the Funds must adduce some evidence of the formation of a legally valid contract. *Hashemi v. Shack,* 609 F.Supp. 391, 393 (S.D.N.Y.1984). "It is fundamental that an explicit undertaking to perform a specific task is required to establish an attorney-client relationship." *Sucese v. Kirsch,* 199 A.D.2d 718, 719, 606 N.Y.S.2d 60, 62 (3d Dep't 1993) (affirming dismissal of malpractice action on summary judgment where plaintiff failed to show he retained defendant as his attorney for transaction about which he was complaining).

Moreover, to withstand a motion for summary judgment, the non-moving party must comply with the requirements of Fed. R.Civ.P. 56(e), which provides in relevant part:

> [O]pposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

A hearsay affidavit of counsel, unsupported by other competent proof, "does not comply with Rule 56(e)." *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 831, 70 S.Ct. 894, 896, 94 L.Ed. 1312 (1950). *See also Accord Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("a hearsay affidavit is not a substitute for the personal knowledge of a party"). The Funds have not met this requirement.

The Funds have not met their burden of demonstrating the existence of a question of fact as to whether the Albanese Defendants were employed as the Funds' counsel when the subject real estate transactions occurred and whether they undertook the defense of the Pension Fund or 32–36 Corp. in the Pervale Litigation. Because the Funds have not established a contractual undertaking on the part of the Albanese Defendants with respect to the matters upon which the Funds' malpractice claims are based, those claims against the Albanese Defendants will be dismissed.

The Funds have not produced any retainer agreement evidencing an attorney-client relationship with the Albanese Defendants. The Funds note that the Albanese Defendants received payment for their legal services to Zotollo from the Funds rather than from Zotollo personally. This fact, while relevant, is insufficient to raise a question of fact as to whether an attorney-client relationship existed between the Funds and the Albanese Defendants, particularly in light of the Albanese Defendants' explanation of the payment, which has not been refuted by anyone with personal knowledge.

 Albanese attests that he attended trustee's meetings with Zotollo in connection with his personal representation of Zotollo, and that he submitted bills for his services directly to the Funds because he was instructed to do so by the Funds' Administrator, Ms. Audrey Hinkly. In the face of Albanese's sworn statement based on personal knowledge, the Fund's unsupported speculation regarding the meaning of the payment arrangement is insufficient to defeat summary judgment. In any event, the payment of legal fees by a third person creates no attorney-client relationship or privity between the attorney and his client's benefactor. *See Priest v. Hennessy,* 51 N.Y.2d 62, 69–70, 431 N.Y.S.2d 511, 515, 409 N.E.2d 983 (1980).

█ The Funds claim that they were ultimately the Albanese Defendants' client, as the Trustee serves the Funds. When an attorney has been retained as counsel to an individual representative of an entity, however, the attorney's client is the representative alone and not the entity or its beneficiaries:

> An attorney for a trustee owes no duty to the beneficiaries of a trust. A duty to a beneficiary would conflict with the undivided loyalty owed the fiduciary to interpret legal obligations or to resolve conflicting claims. That rule is not altered merely because the attorney's compensation comes out of the trust corpus.

4 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 31.4 (citations omitted). Consistent with the attorney's duty to the representative in this circumstance, neither the entity nor its beneficiaries have any right to sue the representative's attorney for professional negligence. *See Kramer v. Belfi,* 106 A.D.2d 615, 616, 482 N.Y.S.2d 898, 900 (2d Dep't 1984) (dismissing claims for legal malpractice brought by estate's beneficiaries against attorneys retained to represent executor only).

The Minutes of the Trustee meetings do not support the existence of an attorney-client relationship between the Albanese Defendants and the Funds until they were appointed as co-counsel to the Real Estate Committee on November 4, 1992. The Funds contend that the Minutes, which identify the Albanese Defendants only as "Attorneys for Employer–Designated Trustee, Anthony J. Zotollo," are insufficiently complete and should not be taken at face value. The Funds contend that this designation was merely a shorthand description because, although Albanese became co-counsel to the Real Estate Committee in November 1992 and joined the Investment Committee in February 1993, the Minutes did not reflect these changes. The Minutes, however, do demonstrate that it was not until November 4, 1992 that the Albanese Defendants were proposed as counsel to the Real Estate Committee, and it was not until July 7, 1993 that they were appointed as co-counsel to the Funds.

In an effort to demonstrate that the Minutes are not a complete records of the scope of various attorneys' representation, the Funds note that although C & L was listed in the Minutes only as attorneys for a particular trustee, they rendered services directly to the Funds. The Minutes, however, describe C & L as "counsel to the Real Estate Committee" during that period. In that capacity, C & L reported at each meeting between 1987 and 1990 about the status of the various real estate transactions. The Albanese Defendants, by contrast, are only referred to as counsel for Zotollo until their engagement as the Funds' counsel on November 4, 1992. The Minutes thus indicate that during the period in question the Funds were advised exclusively by their own independent counsel regarding the subject real estate transactions, and not by the Albanese Defendants.

Finally, the Funds point to the inclusion of the Albanese Defendants in certain tax forms (the "Forms 5500") prepared by the Funds' auditors as evidence that the Funds believed that the Albanese Defendants were their attorneys. But the Funds have offered no explanation of the inclusion of the Albanese Defendants among those listed in the Forms 5500, or any statement concerning the Funds' belief that the Albanese Defendants represented them. The Forms 5500 themselves establish only that the Funds reported to the IRS that payments had been made to the Albanese Defendants from Fund assets, which is consistent with the billing arrangement described above. Moreover, the Funds' belief that the Albanese Defendants were their attorneys is not sufficient to establish the existence of an attorney-client relationship. *Kubin v. Miller,* 801 F.Supp. 1101, 1115 (S.D.N.Y.1992) ("[A]lthough the so-called client's subjective belief can be considered by the court ... this belief is not sufficient to establish an attorney-client relationship.")

The Funds have likewise failed to raise a question of fact as to whether the Albanese Defendants participated in the Funds' representation in the Pervale litigation. The Albanese Defendants have submitted an affidavit based on personal knowledge attesting that the initial inclusion of AA & F on the answer

submitted in that litigation was unauthorized and the result of a clerical error on the part of C & L, the Funds' counsel in that matter. They have also submitted documentary proof that they corrected that mistake by filing a Consent to Withdraw as Counsel, signed by the Funds and by C & L, with the Court.

The Funds concede that they have inspected the files of defendant C & L regarding the Pervale Litigation, but have found no documents supporting the Albanese Defendants' purported representation in that case apart from the documents already submitted by the Albanese Defendants themselves on this motion. Given the absence of any evidence supporting the Funds' allegations, no question of fact exists as to the Albanese Defendants' representation of the Funds in the Pervale litigation.

The Funds' reliance on the Albanese Defendants' failure to conclusively demonstrate that they were not the Funds' counsel is insufficient to defeat summary judgment. *See, e.g., Rhode Island Depositors Economic Protection Corp. v. Hayes,* 64 F.3d 22, 27–28 (1st Cir.1995) (affirming dismissal of legal malpractice claims asserted by limited partners against law firm that had represented partnership, where law firm had challenged existence of attorney-client relationship with limited partners themselves: "[W]e conclude that the limited partners rely on nothing more than repeated conclusory assertions about the nature of their relationship with [the law firm], . . . [which are] not enough to survive summary judgment on the question of whether an attorney-client relationship actually existed."); *Sheinkopf v. Stone,* 927 F.2d 1259, 1268 (1st Cir.1991) ("In the absence of any objective evidence that [defendant] undertook to act as [plaintiff's] attorney, or had agreed to do so, a contract to furnish legal services cannot be implied" and summary judgment was properly granted); *Crossland Savings FSB v. Rockwood Ins. Co.* 692 F.Supp. 1510, 1515 (S.D.N.Y.1988) (summary judgment granted because the putative client "has not proffered the contract . . . or any other evidence" of an attorney-client relationship but instead relied solely on "the mere conclusory allegations in [its] memorandum").

In the face of the sworn testimony of Albanese and Zotollo, the Funds's silence is insufficient to defeat summary judgment. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 923 (2d Cir.1985) ("the party opposing the [summary judgment] motion may not stand mute in reliance solely upon its allegations when facing a substantial evidentiary submission refuting its claim"); *Moon v. Central Intelligence Agency,* 514 F.Supp. 836, 839–40 (S.D.N.Y.1981) ("In view of the fact that plaintiff's allegations are denied by affidavits of [defendant] based on personal knowledge, plaintiff's allegations will not preclude summary judgment.").

### D. *An Attorney–Client Relationship with the Funds Cannot Be Presumed Based on the Albanese Defendants' Representation of Zotollo*

■ The Funds argue in the alternative that the Albanese Defendants' representation of Anthony Zotollo created an attorney-client relationship with the Funds. According to the Funds, an attorney who renders advice to an ERISA fund trustee concerning the administration of the fund is presumed to have an attorney-client relationship with the fund and/or its beneficiaries. The Funds thus contend that, even if no evidence of an attorney-client relationship exists, such a relationship can legally be presumed from the Albanese Defendants' representation of Zotollo.

The cases upon which the Funds rely, however, address only whether communications between trustees of a pension fund and their counsel are protected by the attorney-client privilege from disclosure to the fund's beneficiaries. *See, e.g., Helt v. Metropolitan Dist. Comm'n,* 113 F.R.D. 7 (D.Conn.1986); *Washington–Baltimore Newspaper Guild Local 35 v. Washington Star Co.,* 543 F.Supp. 906 (D.D.C.1982); *United States v. De Lillo,* 448 F.Supp. 840 (E.D.N.Y.1978).

The authorities cited by the Funds indicate that, notwithstanding the above-described exception to the attorney-client privilege, a trustee's status as a fiduciary does not create a presumed attorney-client relationship between the trustee's counsel and either the trust or its beneficiaries. In *Weingarten v.*

*Warren,* 753 F.Supp. 491, 496–97 (S.D.N.Y. 1990), the court dismissed a claim for malpractice brought by a trust beneficiary against counsel for the trustee on the ground that, absent some special circumstances, "there is no justification for abandoning the privity requirement." The ethical opinion cited by the Funds makes the point states: "[A]bsent specific circumstances to the contrary, beneficiaries have no attorney-client relationship with the executor's lawyer." N.Y. St. Bar Ass'n Comm'n on Professional Ethics Op. 649 at 2 n. 2 (1993). *Accord* 4 Ronald E. Mallen & Jeffrey M. Smith, Legal Malpractice § 31.4 (1996) ("An attorney for a trustee owes no legal duty to the beneficiaries of a trust."). In *Riggs Nat'l Bank v. Zimmer,* 355 A.2d 709 (Del.Ch.1976), the court explained that its decision on the issue of privilege did not stem from the notion that the trustee's attorney could be viewed, either in fact or by implication, as having represented the trust's beneficiaries:

> There is no 'substantial need' [for disclosure] in the sense that the beneficiaries need to know the legal views expressed in the memorandum. They do not as they are represented by competent counsel and can get expert advice on the law. But, the beneficiaries are entitled to know what the trustees did, that is, what legal opinion was sought on their behalf and what was done in light of that opinion on their behalf.

*Id.* at 716.

## VIII. *Plaintiffs Have Not Met the Requirements of Rule 56(f)*

The Funds seek a continuance of this motion on the ground that they require more discovery. To such obtain relief under Rule 56(f), the party seeking additional discovery must demonstrate with specificity all of the following:

1) the nature of the uncompleted discovery, *i.e.,* what facts are sought and how they are to be obtained; and

2) how these facts are reasonably expected to create a genuine issue of material fact; and

3) what efforts the affiant has made to obtain these facts; and

4) why those efforts were unsuccessful.

*Burlington Coat Factory Warehouse Corp.,* 769 F.2d at 926. Under this four-part test, "[a] court can reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered." *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir.1994).

The Funds have not satisfied this standard. They have not specifically identified what information they seek to discover or how they would obtain it. The affidavit submitted by the Funds' counsel states only that the Funds will conduct depositions of relevant witnesses and will seek to obtain the relevant documents. Such a statement does not support a Rule 56(f) stay. *See Burlington Coat Factory Warehouse Corp.,* 769 F.2d at 926 (rejecting request for adjournment where plaintiff had not "stated which employees it wanted to depose or disclosed with any specificity what it desired to elicit"); *In re Canandaigua Sec. Lit.,* 944 F.Supp. 1202, 1214 (S.D.N.Y.1996) (rejecting Rule 56(f) request where "plaintiffs have not identified any specific discoverable information" that would shed light on the allegations in their complaint); *Sterling v. Interlake Indus.,* 154 F.R.D. 579, 587 (E.D.N.Y.1994) ("[n]othing in the plaintiff's affidavit ... identifies specific issues to be disclosed if the court grants the opportunity to plaintiff to pursue additional discovery").

The Funds have not specified how further discovery will enable them to establish the existence of an attorney-client relationship with the Albanese Defendants. The only two potential deponents they specify with respect to their claims on the real estate transactions are Albanese and Zotollo, and these witnesses have both already attested that no attorney-client relationship between the Funds and the Albanese Defendants existed at the time of those transactions.

Relief under Rule 56(f) is not appropriate where the discovery allegedly desired "pertain[s] to information already available to [the non-moving party]." *Frankel v. ICD Holdings S.A.,* 930 F.Supp. 54, 66 (S.D.N.Y. 1996). The Funds' central allegation is that

they had a contractual relationship with the Albanese Defendants at the time of the subject real estate transactions; they should be able to demonstrate as much through their own witnesses and documents. Their failure to do so confirms that no evidence of an attorney-client relationship existed between the parties, and militates against their request for a continuance. *See Paul Kadair, Inc. v. Sony Corp.*, 694 F.2d 1017, 1032 (5th Cir.1983) (request for stay under Rule 56(f) denied because "evidence in refutation of [movant's] averments and in support of [the opposing party's] conspiracy claim was available to [the opposing party] if its allegations of conspiracy were true").

With respect to the Funds' claim concerning the Pervale Litigation, the Funds concede that they have already taken discovery of C & L's files and been unable to support their claim. The Funds themselves are in a position to know whether they retained the Albanese Defendants to defend that litigation, as their complaint alleges, and they have come forward with nothing to show the alleged retention ever occurred. Their request for more discovery on claim arising from the Pervale Litigation thus fails to meet the requirements of Rule 56(f), and will be denied.

### Conclusion

For the reasons set forth above, the Levin Defendants' motion to dismiss is hereby granted in part and denied in part, and the Funds' cross-motion for partial summary judgment is hereby denied. The Albanese Defendants' motion for summary judgment is hereby granted. The Cunningham Defendants' motion for partial summary judgment is hereby granted in part and denied in part.

It is so ordered.