**MASON TENDERS DISTRICT COUNCIL PENSION FUND, et al., Plaintiffs,**

v.

**James MESSERA, et al., Defendants.**

No. 95 Civ. 9341(RWS).

United States District Court, S.D. New York.

May 7, 1998.

Proskauer Rose, New York City (Myron D. Rumeld, Ravi B. Motwani, of counsel), for Plaintiffs.

Zuckerman, Spaeder, Goldstein, Taylor & Kolker, New York City (Edward J.M. Little, Jody Kasten, of counsel), for Defendant Estate of Carl Tunick.

## OPINION

SWEET, District Judge.

Defendant Carl Tunick ("Tunick") has moved for summary judgment pursuant to Rule 56, Fed.R.Civ.P. dismissing three malpractice claims and one ERISA breach of fiduciary claim asserted against him by Plaintiffs, the Mason Tenders' District Council Trust Funds.

For the reasons set forth below, Tunick's motion for summary judgment will be granted.

### The Parties

The parties, prior proceedings, and facts in this action have been set forth in three prior opinions of this Court, familiarity with which is assumed. *See Mason Tenders Dist. Council Pension Fund v. Messera,* No. 95 Civ. 9341, 1996 WL 351250 (S.D.N.Y. June 26, 1996); *Mason Tenders Dist. Council Pension Fund v. Messera,* No. 95 Civ. 9341, 1996 WL 578048 (S.D.N.Y. Oct. 8, 1996); *Mason Tenders Dist. Council Pension Fund v. Messera,* 958 F.Supp. 869 (S.D.N.Y.1997). The parties, facts, and prior proceedings relevant to the instant motion are set forth below.

The Mason Tenders' District Council Trust Funds consist of seven "employee pension benefit plans" or "employee welfare benefit plans" within the meaning of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1002(3).[1] They provide benefits to members of local unions affiliated with the Laborers' International Union of North America ("LIUNA"), which local unions together comprise the Mason Tenders' District Council of Greater New York (the "District Council"). The Mason

---

**1.** The Mason Tenders' District Council Trust Funds include the Pension, Welfare, Annuity, Asbestos Training, Industry, Legal Services, and Vacation Funds.

Tenders' District Council Trust Funds are administered by the District Council and contributing employers in the industry. For the purposes of this motion, "Funds" shall include the Mason Tenders District Council Pension Fund ("Pension Fund") and the Mason Tenders District Council Welfare Fund ("Welfare Fund") (collectively, the "Funds") because the claims raised against Tunick relate to real estate investments made, and losses incurred, only by those two Funds.

Defendant Tunick was an attorney. After the initial filing of motion papers, on or about October 31, 1997, Tunick passed away. Tunick's reply brief in further support of the motion for summary judgment was submitted on behalf of Tunick's estate.

### Prior Proceedings

The Funds are trust funds established under the auspices of the District Council which have provided benefit plans to the members of the Mason Tenders' local unions which are organized as part of LIUNA. The District Council, the governing body of the local unions, entered into a consent decree on December 27, 1994, in a civil action, *U.S. v. Mason Tenders Dist. Council*, 1994 WL 742637, 94 Civ. 6487(RWS), brought by the Government against it alleging violations of the Racketeer Influenced and Corrupt Organization Act ("RICO"), including certain improprieties with respect to the administration of the Funds.

On November 2, 1995, this action was commenced, pleading eighty-four causes of action against nearly fifty separate defendants. The gravamina of this action are the first four claims, which plead violations of 18 U.S.C. § 1962(b) and of RICO, and of 18 U.S.C. § 1962(d), conspiracy to violate 18 U.S.C. § 1962(b) and (c). The remaining causes of action allege various statutory and common law claims.

On August 20, 1996, Plaintiffs moved to amend the complaint. The motion was granted on September 23, 1996, and the First Amended Complaint (for the purposes of this motion, the "Complaint") was filed on October 1, 1996. On November 4, 1997, the parties stipulated and agreed to dismiss all claims against Defendants Gerard Cunningham ("Cunningham") and the law firm Cun-

ningham & Lee ("C & L") (collectively, the "Cunningham Defendants") A Second Amended Complaint was filed on November 20, 1997.

On October 22, 1996, Defendants Joseph Albanese ("Albanese") and Albanese, Albanese & Fiore ("AA & F") (collectively, the "Albanese Defendants") filed a motion for summary judgment, seeking dismissal of malpractice claims against them. In an opinion dated March 26, 1997, the malpractice claims were dismissed against the Albanese Defendants because Plaintiffs failed to prove an attorney-client relationship with the Funds. *See Mason Tenders Dist. Council Pension Fund v. Messera*, 958 F.Supp. 869 (1997) [hereinafter the *Albanese Decision*].

Tunick filed the instant motion for summary judgment on September 15, 1997. Oral argument was heard on March 12, 1998, at which time the motion was deemed fully submitted.

After filing this motion, the parties stipulated and agreed to dismiss the ERISA breach of fiduciary claim against Tunick without prejudice. Accordingly, this opinion addresses the remaining claims against Tunick.

### Facts

#### I. The Real Estate Transactions

Plaintiffs allege that between November 1989 and February 1990, the Pension Fund purchased eight properties in Brooklyn, New York (the "Brooklyn Properties") based on "false and fraudulent real estate appraisals that grossly inflated the true value" of these properties. The Brooklyn Properties were purchased from a member of the Genovese Organized Crime Family, Charles Trentacosta, and Trentacosta made a profit of $1,341,903.05 in the transaction.

At around the same time, the Funds were the victim of a separate fraudulent transaction involving a property located at 32–36 West 18th Street (the "18th Street Building"). Plaintiffs allege that in December 1989, defendant Ronald Miceli, now a convicted racketeer, arranged to purchase the 18th Street Building for $7,465,000. Miceli obtained a $15,850,000 loan from the Pension

Fund in February 1990 in order to purchase the Building. As security for the loan, the Pension Fund obtained a mortgage on the 18th Street Building and on another piece of commercial property owned by Miceli in Long Island, New York. The loan had previously been discussed at a Board of Trustees' meeting held on December 6, 1989, and its consummation was reported to the trustees by the Funds' real estate counsel at a subsequent meeting held on March 8, 1990. The minutes of that meeting show that there was discussion concerning the transaction, including an inquiry as to whether there were limitations in the Trust documents on the percentage of Pension Fund assets that could be invested in real estate. There is no indication in these minutes or any subsequent minutes that any of the attorneys present responded to that inquiry.

On the same date Miceli procured the loan, he purchased the building for $7,465,000. Approximately eight months later, at a Board of Trustees' meeting conducted on November 13, 1990, the trustees approved the Pension Fund's purchase of the 18th Street Building from Miceli for $24 million. There is no evidence of any explanation as to why the property was purchased for nearly $10 million more than the amount of the loan made nine months earlier, and about $16.5 million more than the price Miceli had obtained. Nor is there any evidence to suggest that any inquiry was made into the existence of appraisals that would justify the $24 million purchase price.

Furthermore, there is no evidence in the Board of Trustees' meeting minutes to suggest that any of the professionals alerted the Trustees to the fact that their fiduciary liability policy contained an exclusion which stated: "coverage as provided hereunder shall apply to an investment by the Fund in real estate and/or mortgage that is: ... specifically directed or approved by and managed by a Qualified Professional Asset Manager ("QPAM")."

Shortly before the loan transaction in February, the Fund had obtained three appraisals on the 18th Street Building. Two of the appraisals valued the property at approximately $15,900,000, while the third valued it at only $8,300,000. The third appraisal also noted that the property had been purchased just two years earlier for only $7.7 million. As of October 1991, the 18th Street Building was valued at $5 million, notwithstanding the fact that the Pension Fund had by then invested several million dollars in renovating the site, over and above the $24 million purchase price.

In the related civil action filed by the Government, this Court granted summary judgment against two of the Funds' former trustees, Joseph Fater and James Lupo, finding that they had breached their fiduciary duties in connection with the purchase of the 18th Street Building. *See United States v. Mason Tenders Dist. Council,* 909 F.Supp. 882, 887 (S.D.N.Y.1995). The Court entered a judgment in the amount of $16,535,000 for losses associated with the purchase of the 18th Street Building.[2]

A third fraudulent real estate transaction occurred with respect to a property located at 6060 Indian Creek Drive, Miami Beach, Florida (the "Indian Creek Property"). The Indian Creek Property was purchased by the Welfare Fund in 1987 from the mother of defendant James Messera, a "capo" in the Genovese Organized Crime Family and now a convicted racketeer. The $1.45 million purchase price paid by the Welfare Fund was allegedly twice the property's appraised value.

## II. *Tunick's Activities In Connection With the Funds*

The Funds claim to have had an attorney-client relationship with Tunick when the above-described real estate purchases were made. The Minutes of the Regular Joint Meetings of the Board of Trustees of the Mason Tenders District Council Pension, Welfare and Annuity Funds (the "Minutes")

---

**2.** The losses were determined based on the difference between the price at which Miceli had purchased the property ($7,465,000), which was deemed to be the fairest assessment of the fair market value at the time, and the amount that the Pension Fund paid for the property ($24,-000,000) nine months later. *See* 909 F.Supp. at 891, 894–95.

contain no affirmative representation that Tunick represented the Funds during this period. Tunick was identified as counsel to the Union–Designated Trustees, which depending on the relevant time frame included Gasper Lupo, Frank Lupo, and/or James Lupo (the "Trustees"). The Minutes indicate that the Funds were represented by the firms of Levin & Weissman and Davis & Davis.

As the Trustees' personal attorney, Tunick accompanied them to Board of Trustees' meetings (between the years 1985 and 1994) to protect their individual interests and advised them on an as-needed and as-requested basis.

The Declaration of Trust, under which the Funds were created, authorized the trustees, including Gasper, Frank, and James Lupo, to obtain reimbursement from the Funds for the expenses they incurred in performing their duties. According to Tunick, the Funds' Administrator, Ms. Audrey Hinkly–Tabor and her successors, instructed Tunick to send his bills for representing the Trustees directly to the Funds rather than requiring the Trustees to pay the bills in the first instance and thereafter obtain reimbursement from the Funds. Tunick followed those instructions throughout the period he served as counsel to the Trustees. While Ms. Hinkly–Tabor claims no recollection of discussing with Tunick whether he should send his bills directly to the Funds, she confirmed that the practice of billing the Funds directly had been in place for many years.

At a Board of Trustees' meeting on September 26, 1989, Tunick was appointed counsel to the Industry Fund effective October 1, 1989. He undertook representation of the Legal Services Fund after the real estate transactions which are the subject of this motion. Neither the Industry or Legal Services Fund invested in the real estate transactions at issue. Tunick was also a member of Plaintiffs' Investment Committee, which dealt exclusively with Plaintiffs' portfolio of securities and not real estate investments. Real estate transactions were within the province of the Real Estate Committee. The Minutes do not reflect that Tunick ever acted as counsel to the Real Estate Committee.

In an affidavit submitted by Plaintiffs, Cunningham, the attorney who prepared the various closing documents in connection with the 18th Street Building transactions, states that he had three meetings with Tunick at which the 18th Street Building transactions were discussed and at which he looked to Tunick, together with Frank Lupo and Arthur Blau, for guidance and advice. The first meeting was on January 24, 1990, the second was a phone conference on January 30, 1990, and the third was a meeting at a coffee shop on October 31, 1990. Tunick was present at all three meetings with his client, the Union–Designated Trustee Frank Lupo.

### III. *The Claims Against Tunick*

The Complaint alleges three malpractice claims against Tunick, arising from the Funds' purchase of the Brooklyn Properties, the 18th Street Building, and the Indian Creek Property. The Fifty-sixth claim relates to the purchase of the Brooklyn Properties; the Sixty-second claim (the Sixty-first claim in the Second Amended Complaint) relates to the purchase of the 18th Street Building; and the Sixty-eighth claim (Sixty-sixth claim in the Second Amended Complaint) relates to the purchase of the Indian Creek Property. The Eighty-fourth claim (the Seventy-eighth in the Second Amended Complaint) seeks compensation from Tunick for ERISA violations for breach of fiduciary duty. As stated above, this claim has been dismissed by the parties.

The malpractice claims against Tunick are essentially identical to the dismissed malpractice claims brought against the Albanese Defendants. Each malpractice claim alleges that there was a contractual relationship between the Funds and Tunick, pursuant to which Tunick agreed to provide legal services to the Funds; that the Funds paid Tunick for such legal services; that Tunick routinely attended meetings of the Boards of Trustees of the Funds, including meetings where the Investment Committee and Real Estate Committee presented reports and recommendations, and the Funds looked to Tunick for legal advice; that the parties' "attorney-client relationship" created a duty to represent the Funds with reasonable care; and

that Tunick had a duty to advise the Funds that the purchase prices for properties in question were grossly inflated and that the Funds should have retained a Qualified Professional Asset Manager in connection with their purchases of the properties.

### Discussion

#### I. Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall grant a motion for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See Silver v. City University*, 947 F.2d 1021, 1022 (2d Cir.1991).

"The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish her right to judgment as a matter of law." *Rodriguez v. City of New York*, 72 F.3d 1051, 1060 (2d Cir. 1995). In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988).

A party seeking to defeat a summary judgment motion cannot "rely on mere speculation or conjecture as to the true nature of facts to overcome the motion." *Lipton v. Nature Co.*, 71 F.3d 464, 469 (2d Cir.1995) (quoting *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir.1986)). Rather, the responding party "must show the existence of a disputed material fact in light of the substantive law." *Peer Int'l Corp. v. Luna Records, Inc.*, 887 F.Supp. 560, 564 (S.D.N.Y.1995). In the absence of any disputed material fact, summary judgment is appropriate.

#### II. No Question of Fact Exists as to Whether Tunick Had an Attorney–Client Relationship with the Funds

An essential element of the Funds' malpractice claims against Tunick is an attorney-client relationship between Tunick and the Funds. According to Tunick, he served as counsel only to the Trustees, in their capacity as Fund trustees, and not the Funds themselves.

In the *Albanese Decision*, this Court set the legal principles and standards governing the motion at bar. As per the decision, an attorney may not be held liable for negligence in the provision of professional services adversely affecting one with whom the attorney is not in contractual privity. *See, e.g., National Westminster Bank USA v. Weksel*, 124 A.D.2d 144, 146, 511 N.Y.S.2d 626, 628 (1st Dep't 1987); *Compusort, Inc. v. Goldberg*, 606 F.Supp. 456, 457 (S.D.N.Y. 1985).

This privity requirement is based upon basic ethical considerations. "A primary reason for refusing to expand privity is to avoid a potential conflict since the interests of the attorney's client ... may not be harmonious with other persons...." 4 Ronald E. Mallen & Jeffrey M. Smith, *Legal Malpractice* § 31.4 (4th ed.1996) (citations omitted). "New York, by adopting an attorney-protective strict privity rule, has articulated a strong interest in protecting its ... attorneys from suits by non-clients." *LNC Investments, Inc. v. First Fidelity Bank*, 935 F.Supp. 1333, 1351 (S.D.N.Y.1996).

To establish the existence of an attorney-client relationship, the Funds must adduce some evidence of the formation of a legally valid contract. *Hashemi v. Shack*, 609 F.Supp. 391, 393 (S.D.N.Y.1984). "It is fundamental that an *explicit undertaking* to perform a *specific task* is required to establish an attorney-client relationship." *Sucese v. Kirsch*, 199 A.D.2d 718, 719, 606 N.Y.S.2d 60, 62 (3d Dep't 1993) (emphasis added) (affirming dismissal of malpractice action on summary judgment where plaintiff failed to show he retained defendant as his attorney for transaction about which he was complaining).

The contractual privity requirement employed in the *Albanese Decision* does not imply that "indicia of a formal relationship are necessary." *First Hawaiian Bank v. Russell & Volkening, Inc.*, 861 F.Supp. 233,

238 (S.D.N.Y.1994). However, some agreement, based on contract principles, that Tunick and the Funds entered into an attorney-client relationship is required for the instant motion as it was in the *Albanese Decision*.

The Funds point to *First Hawaiian* for a recitation of factors courts have considered in deciding the existence of such a relationship:

> 1) whether a fee arrangement was entered into or a fee paid; 2) whether a written contract or retainer agreement exists indicating that the attorney accepted representation; 3) whether there was an informal relationship whereby the attorney performed legal services gratuitously, 4) whether the attorney actually represented the individual in one aspect of the matter (e.g., at a deposition); ... 6) whether the purported client believes that the attorney was representing him and whether this belief is reasonable.

*Id.* (citations omitted). The Funds use these factors to demonstrate that courts recognize that initial arrangements for representation are often informal, and thus, it is necessary to look at the parties' words and actions to determine the existence of the attorney-client relationship. The cases the Funds cite for support, however, do little to advance their contention given the facts of this case. In *Keoseian v. Von Kaulbach,* 707 F.Supp. 150 (S.D.N.Y.1989), and *United States v. International Bhd. of Teamsters,* 133 F.R.D. 99 (S.D.N.Y.1990), the findings of an attorney-client relationship were based on written, executed retainer agreements. Indeed, both cases hinged on the fact that no case was found "where a person who signed a retainer agreement was nevertheless found not to be a client." *Keoseian,* 707 F.Supp. at 152; *International Bhd. of Teamsters,* 133 F.R.D. at 102. In Plaintiffs' third case, *Schwartz v. Greenfield, Stein and Weisinger,* 90 Misc.2d 882, 885, 396 N.Y.S.2d 582, 584 (Sup.Ct. Queens Co.1977), the attorney met "face to face" with the client and affirmatively "undertook a duty to the plaintiff personally."

Moreover, as stated in the *Albanese Decision,* 958 F.Supp. at 891, to withstand a motion for summary judgment, the non-moving party must comply with the requirements of Fed.R.Civ.P. 56(e), which provides in relevant part:

> [O]pposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

A hearsay affidavit of counsel, unsupported by other competent proof, "does not comply with Rule 56(e)." *Automatic Radio Mfg. Co. v. Hazeltine Research, Inc.,* 339 U.S. 827, 831, 70 S.Ct. 894, 94 L.Ed. 1312 (1950); *see also Accord Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("a hearsay affidavit is not a substitute for the personal knowledge of a party"). The Funds fall short of this requirement.

The Funds have not met their burden of demonstrating the existence of a question of fact as to whether Tunick was employed as the Funds' counsel when the subject real estate transactions occurred. Because the Funds have not established a contractual undertaking as required in the *Albanese Decision* on the part of Tunick with respect to the matters upon which the Funds' malpractice claims are based, those claims will be dismissed. Even application of the *First Hawaiian* factors do not save the Funds' malpractice claims.

The Funds have not produced a retainer agreement evidencing an attorney-client relationship with Tunick, any evidence of discussions or negotiations with Tunick regarding representation, or a single document evidencing that any such agreement was reached. Instead, the Funds assert that they and Cunningham treated Tunick as counsel for the following reasons: Tunick's payments by the Funds, the Funds' identification of Tunick's fees on certain tax forms ("Forms 5500"), his regular attendance at Board of Trustees' meetings, and the Funds' approval of Tunick as Trustee counsel. Each of these reasons was discussed and found to be unpersuasive as evidence of an attorney-client relationship in the *Albanese Decision.* The Funds also contend that, unlike the Albanese Defendants, Tunick was deeply involved with the Funds generally, and Cunningham relied on Tunick's advice regarding the purchase on

the 18th Street Building. These contentions are likewise unpersuasive.

■ The Funds note that Tunick received payment for legal services to the Trustees from the Funds rather than the Trustees personally. While relevant, this fact is insufficient to raise a question of fact as to whether an attorney-client relationship existed between the Funds and Tunick, particularly in light of Tunick's explanation of the payment, which has not been refuted by anyone with personal knowledge. Tunick attests that he attended the Board of Trustees meetings in connection with his personal representation of the Trustees—Gasper, Frank, and/or James Lupo, depending on the time period—and that he submitted bills for his services directly to the Funds because he was instructed to do so by the Funds' Administrator, Ms. Audrey Hinkly–Tabor.[3] The parties dispute whether the Declaration of Trust, under which the Trust was created and pursuant to which the payments were made, authorize such payment. In the face of Tunick's sworn statement based on personal knowledge, however, and Funds' unsupported speculation regarding the meaning of the payment arrangement is insufficient to defeat summary judgment. In any event, as stated in the *Albanese Decision,* "the payment of legal fees by a third person creates no attorney-client relationship or privity between the attorney and his client's benefactor." *Albanese Decision,* 958 F.Supp. at 891 (citing *Priest v. Hennessy,* 51 N.Y.2d 62, 69–70, 431 N.Y.S.2d 511, 515, 409 N.E.2d 983 (1980)).

The Funds point to the inclusion of Tunick in Forms 5500 from 1983 to 1994, which were prepared by the Funds' auditors as evidence that the Funds believed that Tunick was their attorney. The only explanation the Funds offer for the inclusion of Tunick among those listed in the Forms 5500 is that payments to Tunick were treated as payments to a Funds' service provider. This is consistent with the billing arrangement described above.

Tunick's attendance at Board of Trustees' meetings, like that of the previously-dismissed Albanese Defendants, was solely in his capacity as counsel to the Trustees. This is evident on the face of all of the Minutes during the relevant time-frame. Despite their failed attempt in the *Albanese Decision,* the Funds nonetheless contend that the Minutes, which identify Tunick only as "Attorney for Union–Designated Trustees, Frank Lupo and James Lupo," are unreliable and should not be taken at face value. Once again, the Funds' effort to demonstrate the unreliability and insufficiency of the Minutes is without merit, as it does nothing to prove the existence of an attorney-client relationship between Tunick and the Funds. *See Albanese Decision,* 958 F.Supp. at 892.

According to the Funds, Tunick was their counsel because his initial retention as "Attorney for the Union–Designated Trustees" required approval of the full board. Again, this fact provides no evidence of an agreement to engage in an attorney-client relationship with the Funds themselves. If anything, it demonstrates that the Funds knew the difference between counsel to the Funds and counsel to the individual trustees, knew that Tunick represented the individual trustees only, and knew that they had never approved Tunick to be their own counsel.

The Funds claim that because of the payments from Fund assets, inclusion in Forms 5500, attendance at Board of Trustees meetings, and approval of Tunick as trustee counsel by the full board, they believed and operated under the assumption that Tunick was their counsel as well. Not only is the evidence on which the Funds based their assumption rejected, but, as found in the *Albanese Decision* and reiterated here, the Funds' subjective belief "is not sufficient to establish an attorney-client relationship." *Albanese Decision,* 958 F.Supp. at 892 (citing *Kubin v. Miller,* 801 F.Supp. 1101, 1115 (S.D.N.Y.1992) ("[A]lthough the so-called client's subjective belief can be considered by the court ... this belief is not sufficient to establish an attorney-client relationship."));

---

3. Ms. Hinkly–Tabor's affidavit does not belie Tunick's assertion. Ms. Hinkly–Tabor only states that she does not recall discussing with Tunick whether he should bill the Funds directly. She does confirm that the practice for direct billing had been in place for many years.

see *Stratavest Ltd. v. Rogers*, 903 F.Supp. 663, 667 (S.D.N.Y.1995) (citing *Kubin*); *Volpe v. Canfield*, 237 A.D.2d 282, 283, 654 N.Y.S.2d 160, 162 (2d Dep't 1997) ("A plaintiff's unilateral belief does not confer upon him the status of client."); *Jane St. Co. v. Rosenberg & Estis, P.C.*, 192 A.D.2d 451, 451, 597 N.Y.S.2d 17, 17 (1st Dep't 1993) (same).

▮ The Funds cite to Tunick's connection with the Investment Committee and his appointment as counsel to the Industry Fund effective October 1, 1989. The Funds provide no evidence linking this involvement to the real estate transactions at issue. The Investment Committee does not make or recommend real estate investments. As the Minutes exhibit, the Investment Committee deals exclusively with the Funds' portfolio of securities. Real estate investments, like the ones here, were the province of the Real Estate Committee, which gave advice regarding the only transactions at issue here. Although Tunick was appointed as counsel to the Industry Fund before the purchases of the 18th Street Building and the Brooklyn Properties, there is no evidence that this appointment had any bearing on the advice received on the real estate transactions. Tunick's involvement generally with the Funds is irrelevant absent a showing that Tunick undertook to perform a specific task involving the real estate transactions. *See Sucese*, 199 A.D.2d at 719, 606 N.Y.S.2d at 62.

▮ The Funds refer to three meetings arranged specifically to negotiate and discuss the implementation of the 18th Street Building transaction at which Cunningham, Tunick, and Frank Lupo were present to assert that Tunick played an instrumental role in determining the terms of the 18th Street Building transaction. In an affidavit submitted by the Funds, Cunningham states he looked to Tunick for advice and guidance in carrying out his real estate responsibilities.[4] According to the Funds, Tunick's participation at the three meetings was legal in nature. It is on the basis of these meetings—not between Tunick and the al-

leged clients, but between Tunick and Cunningham—that the Funds seek to have their attorney-client relationship with Tunick established. The Funds contend that it was Tunick's responsibility to clarify for Cunningham that Tunick was serving in these endeavors only in the capacity of counsel for the Union–Designated Trustees; that even if contractual privity is lacking, the malpractice claims survive so long as Cunningham relied on Tunick's advice in carrying out his duties to the Funds. This contention, under which an attorney could unwittingly be drawn into an attorney-client relationship merely by speaking with a client's counsel, runs afoul of New York's rule requiring an agreement between the attorney and client and the rule refusing to create an attorney-client relationship based on the alleged client's unilateral belief. Under the Funds' theory, not only would a unilateral belief suffice, but it could be the unilateral belief of the alleged client's attorney. Neither Cunningham's purported reliance on Tunick's advice, nor his impression of the relationship between his client and Tunick, can substitute for the contract principles required to create an attorney-client relationship.

The three meetings Cunningham describes in his affidavit are consistent with Tunick's representation of the individual trustees. Indeed, at each of these meetings, Tunick's client, Frank Lupo was present. The Funds, nonetheless, strive to impose an attorney-client relationship on Tunick because Tunick failed to clarify for Cunningham that he was serving as counsel only to Frank Lupo and not the Funds. The Funds seek to impose this duty to clarify by relying on *Schiffli Embroidery Workers Pension Fund v. Ryan, Beck & Co.*, 1994 WL 62124No. 91 Civ. 5433, 1994 U.S.Dist. LEXIS 2154, at *10 (D.N.J. Feb. 23, 1994) [hereinafter *Schiffli* ], and N.Y.Jud.Law, Code of Professional Responsibility, DR 5–109 (McKinney 1996). These two authorities are inapposite to this case, as they refer to the familiar rule that when counsel for a corporation or other entity

---

4. Cunningham was a defendant in this action until the Funds offered him a settlement package to which he agreed. The Funds dismissed their malpractice claims against their former counsel on October 28, 1997. Cunningham's affidavit was executed the next day.

deals with individuals associated with that entity (*e.g.*, officers and directors), the entity's counsel should clarify that he or she does not represent the individual. First, Tunick was counsel for the individual trustee—the person the rule was designed to protect—whereas the rule only applies to counsel for the organization. Second, Tunick was not dealing with the client, as required for the rule to be invoked, but with Cunningham, the Funds' attorney. Third, the rule applies "where it appears that the organization's interests may differ", DR 5–109, which it did not at that point.

Finally, under the New Jersey case, *Schiffli*, the rule applies in circumstances where "the lawyer believes that such explanation is necessary to avoid misunderstanding. . . ." *Schiffli*, 1994 WL 62124, 1994 U.S.Dist. LEXIS 2154, at *9 (quoting N.J. RPC 1.13). The Funds' assertion is not backed by any evidence suggesting that it was reasonable for Cunningham to conclude that Tunick had extended his representation beyond his existing and present client, Frank Lupo. Each attorney's role was clearly identified at every Board of Trustees' meeting. The Minutes and the Funds' approval of Tunick as trustee counsel support the notion that the Funds understood Tunick's role. There is no evidence to show that the Funds ever discussed with Tunick the possibility of retaining him. Cunningham apparently did not voice any confusion regarding Tunick's role at the time of these meetings. Thus, if *Schiffli* applied to this case, Tunick's failure to clarify his role would be justified because there is no evidence to show that Tunick should have been aware that his role may have been misunderstood.

Contractual privity is clearly lacking. Therefore, an attorney-client relationship between Tunick and the Funds cannot be established. Application of the factors extracted from *First Hawaiian* will not change the outcome. There is no written contract or retainer agreement indicating that Tunick accepted representation of the Funds; no evidence of an informal relationship whereby

Tunick performed legal services gratuitously for the Funds; and no evidence that Tunick represented the Funds in one aspect of the real estate transactions.[5] Two of the remaining *First Hawaiian* factors may at first blush give pause: (1) whether there was a fee arrangement entered into or a fee paid to Tunick by the Funds, and (2) whether the Funds believe Tunick was representing them and whether this belief was reasonable. *See First Hawaiian*, 861 F.Supp. at 238. Upon further study, however, these also fail to provide a basis for finding an attorney-client relationship between Tunick and the Funds. First, as discussed above, the fees paid to Tunick under the Declaration of Trust do not establish that the fees paid to Tunick were for the legal representation of the Funds. Second, it appears the Funds may have believed that Tunick was representing them. But, as discussed above, given the evidence supplied by the parties, any belief the Funds had that Tunick did more than represent the Trustees—whether due to Tunick's regular attendance at Board of Trustees meetings or Cunningham's reliance on Tunick's guidance—was not reasonable.

In the *Albanese Decision,* the Funds asserted to no avail that the Albanese Defendants' representation of the individual trustee *created* an attorney-client relationship with the Funds. For this motion, however, the Funds claim that Tunick's representation of the Trustees *does not preclude* a finding that Tunick owed an independent duty to the Funds. While such a representation would not preclude upholding a duty owed to the Funds on different facts, it certainly precludes fabricating such a relationship here. The Funds extract a quote from 1 Ronald E. Mallen & Jeffrey Smith, *Legal Malpractice* § 7.7, at 500 (4th ed.1996), to support their contention. The treatise's statement that "a lawyer advising and ERISA fiduciary represents the trust's beneficiaries, not the fiduciary personally" does not have bearing on this case. The statement refers to four cases, two of which, *Petz v. Ethan Allen, Inc.* 113

<hr>

5. As discussed above, Cunningham's statements concerning Tunick's legal advice during meetings where the 18th Street Building transaction was discussed do not prove that Tunick was representing the Funds. They are consistent with Tunick's representation of Frank Lupo, the Union–Designated Trustee.

F.R.D. 494 (D.Conn.1985), and *Washington–Baltimore Newspaper Guild, Local 35 v. Washington Star Co.*, 543 F.Supp. 906 (D.D.C.1982), deal exclusively with whether communications between fund attorneys are protected from disclosure from the fund's beneficiaries. The Funds' prior attempt to use *Washington Star Co.* and another privilege case was rejected in the *Albanese Decision*, 958 F.Supp. at 893–94. The only other two cases cited by Mallen & Smith are *Nieto v. Ecker*, 845 F.2d 868 (9th Cir.1988), and *McLaughlin v. Biasucci*, 688 F.Supp. 965 (S.D.N.Y.1988), both of which involve the accountability of the *Funds'* attorney for Fund losses.[6] Thus, these cases do not support the Funds' attempt to create an attorney-client relationship with Tunick.

The Funds also insist a conclusion that Tunick did not owe an independent duty to the Funds would call into question the propriety of the Funds' agreement to pay for Tunick's services and infringe on the general principle that fund assets must be utilized solely for the benefit of the participants. This theory not only conflicts with the analysis above concerning the payment of Tunick's fees and the *Albanese Decision*, but also is unsupported by case law. The Funds' payment of trustee counsel fees in no way violates the rule that fund assets be used for fund purposes. Indeed, the practice likely benefits the Funds, as Tunick contends, if only because qualified trustees would not perform work for the Funds in the absence of independent counsel to advise them.

### III. Plaintiffs' Effort To Recast the Malpractice Claims as Negligent Misrepresentation or Third Party Contract Claims Is Rejected

The Funds contend in the alternative that relief may be available against Tunick either in contract (on a third party beneficiary theory) or via a claim for negligent misrepresentation. The Funds request leave to amend the Complaint if it does not already embrace claims for breach of third party contract or negligent misrepresentation. These claims are not embraced by the pleadings.[7] Still, leave to amend will not be granted because claims of breach of third party contract and negligent misrepresentation are not viable in the instant case.

The Funds wish to create a breach of contract or negligent misrepresentation by fitting this case into the "so close as to approach that of privity" exception discussed in *Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood*, 80 N.Y.2d 377, 382, 605 N.E.2d 318, 320, 590 N.Y.S.2d 831, 833 (1992) [hereinafter *Prudential*]. In essence, the Funds assert, even in the absence of contractual privity, Tunick should be liable because his relationship with the Funds is "so close as to approach that of privity." In *Prudential*, the New York Court of Appeals ruled that a law firm which prepared an opinion letter for a third party involved in a debt restructuring could be sued by that party for negligent misrepresentation notwithstanding the absence of direct privity between the firm and the plaintiff.

According to the Funds, the New York Court of Appeals found that liability could be imposed because "the end and aim of the opinion letter was to provide Prudential with the financial information it required," and "Prudential unquestionably relied on the opinion letter in agreeing to the debt restructuring." *Id.* at 385, 605 N.E.2d at 322, 590 N.Y.S.2d at 835. Thus for similar reasons breach of contract and negligence claims can be pursued against Tunick. The Funds

---

6. In fact, in *McLaughlin*, the proposed third party complaint alleged that the attorney for the ERISA Plan was "assigned the task of investigating" and reporting back to the Plan's trustees. *McLaughlin*, 688 F.Supp. at 968. This Court, reading the complaint in the light most favorable to the movant, granted the motion to file the proposed third party complaint.

7. The Funds' claims are for legal malpractice. There is no allegation of a third party contract or of the attendant duties flowing therefrom. Nor is there any mention of negligent misrepresentation. The Funds allege that "there existed a contractual relationship" between Tunick and the Funds, that Tunick "agreed to provide legal services to the Funds," and that the Funds "looked to Tunick for legal advice." (Cmplt.¶¶ 456–57). The Funds charge that Tunick breached his duty of care flowing from the attorney-client relationship. (Cmplt.¶¶ 458–67, 561–69, 658–66).

claim that Cunningham's affidavit demonstrates that, regardless of whether Tunick was serving the interests of the Trustees, the end aim of the instructions and advice given to Cunningham was to provide him with information he needed to complete the 18th Street Building transaction on behalf of the Funds; by doing so, Tunick—together with Frank Lupo and Arthur Blau—led Cunningham to believe that the due diligence for the transaction had already been performed at the time he received his instructions.

■ The Funds's discussion of *Prudential*, however, fails to set forth the "three critical criteria" for imposing liability under the approaching-privity standard: "(1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance." *Id.* at 384, 605 N.E.2d at 321–22, 590 N.Y.S.2d at 834–35 (citing *Credit Alliance Corp. v. Arthur Andersen & Co.*, 65 N.Y.2d 536, 483 N.E.2d 110, 493 N.Y.S.2d 435 (1985)).

These criteria have been applied strictly by New York courts, including this one, to extend attorney liability only in the most limited of circumstances. *See LNC Investments*, 935 F.Supp. at 1349 ("The exception to the requirement of actual privity has been interpreted narrowly by the New York courts."); *Prudential–Bache Securities, Inc. v. Resnick Water St. Dev. Co.*, 161 A.D.2d 456, 457, 555 N.Y.S.2d 367, 369 (1st Dep't 1990) ("The ambit of duty created by privity and relationships so close as to approach that of privity is narrowly defined in this State...."). Indeed, the Court of Appeals in *Prudential* specifically warned against allowing "limitless liability."

The privity exception has been applied against attorneys in situations where the attorney prepared some formal, written document advising or substantially affecting the rights of a third party. In *Prudential* itself, the negligent acts included the "creation of an opinion letter and the transmission of that letter to a third party for the party's own use, ... carried out by the lawyer at the

client's express direction ....." *Prudential*, 80 N.Y.2d at 382, 605 N.E.2d at 320, 590 N.Y.S.2d at 833. In *Friedman v. Hartmann*, No. 91 Civ. 1523, 1994 WL 97104 (S.D.N.Y. 1994), the plaintiffs, limited partners in a real estate investment partnership, moved to amend their complaint to include negligent misrepresentation and third party contract claims against the attorney for the general partner. The limited partners cited *Prudential* and asserted that as limited partners their relationship with the general partner's counsel was "so close as to approach that of privity." *Id.* at *5. Even though the general counsel's attorney actually prepared the contract containing the alleged misrepresentations, the court nonetheless held that the relationship did not sufficiently approach privity because the attorney did not prepare an opinion letter. *Id.* at *6. In explaining its reasoning, the court emphasized the importance of the third prong of the *Prudential* test—that the attorney evince an understanding of the third party's reliance:

> When an attorney is asked to draft an opinion letter, he is put on notice that he must personally vouch for the statements made therein and that he may be held liable if they are untrue. This provides the attorney with the opportunity to verify those statements to the extent he can, and with regard to factual statements for which he is relying on his client, to qualify his opinion accordingly. Thus it is possible in this narrow context to impose a duty of due care to third parties while still maintaining "fair and manageable bounds to" the attorney's liability.
>
> In contrast, to hold an attorney liable to third parties for the factual inaccuracies of every contract, or every legal document, he prepares would be to lurch towards the "limitless liability" against which the New York Court of Appeals warned in *Prudential*.

*Id.* (citation omitted).

The narrow circumstances in which the privity exception can be invoked was reiterated recently in *LNC Investments*, where trustee First Fidelity Bank's effort to snare counsel to a fellow trustee within the privity exception was denied. First Fidelity, collat-

eral trustee to a failed trust, settled certain claims for investor losses, and then attempted to implead Gibson Dunn, a law firm which represented a different trustee. According to First Fidelity, it could sue the other trustee's counsel, despite having its own counsel, because "its relationship with Gibson, Dunn resembled privity because it relied upon the advice of Gibson, Dunn's clients [the other trustees] and on the joint advice of the trustees' counsel, including Gibson, Dunn." *LNC Investments*, 935 F.Supp. at 1351. First Fidelity's attempt was rejected and the court's reasoning is applicable to the case at bar:

> First Fidelity cannot squeeze its relationship with Gibson, Dunn into New York's narrow exception to the requirement of actual privity....
>
> Here, Gibson, Dunn never furnished an opinion letter to First Fidelity on which First Fidelity reasonably and foreseeably relied. To the extent that Gibson, Dunn supplied general advice to all the trustees, it did so only in its capacity as counsel to [the other trustees]. The other trustees, each of which was represented by its own attorney ... were free to accept or reject Gibson, Dunn's advice. Gibson, Dunn never explicitly assumed the role of counsel to all trustees, and First Fidelity does not assert any facts to suggest that Gibson, Dunn functionally took on that responsibility.

*Id.*

■ As in *LNC Investments*, the Funds' attempt to squeeze its relationship with Tunick into the narrow privity exception falls short. Not only have the Funds not produced an opinion letter from Tunick, but they have not produced a single written document in which Tunick advises or even addresses anyone but his own client, the individual trustees. Nor do the Funds allege, as they must, that they reached an "understanding" with Tunick that he would be providing them information upon which they could rely. Finally, the Funds have not submitted any of the requisite evidence evincing Tunick's understanding of their reliance.

Even accepting Cunningham's affidavit, reliance on Tunick's advice and guidance has not been established. Cunningham claims that Tunick's advice and instructions led him to believe the due diligence on the loan for the 18th Street Building had been performed. He bases his impression on two appraisals he was provided regarding the 18th Street Building. However, Cunningham does not state, nor do the Funds allege, that Tunick obtained or provided those appraisals.[8] The Cunningham affidavit does not suffice to satisfy the stringent privity exception.

### IV. *Plaintiffs Have Not Met the Requirements of Rule 56(f)*

■ The Funds seek a continuance of this motion on the ground that they require more discovery. To obtain such relief under Rule 56(f) of the Federal Rules of Civil Procedure, the party seeking additional discovery must file an affidavit explaining " '(1) the information sought and how it is to be obtained; (2) how a genuine issue of material fact will be raised by that information; (3) what efforts the affiant has made to obtain the information; and (4) why those efforts were unsuccessful.' " *Ruotolo v. Department of Justice, Tax Div.*, 53 F.3d 4, 10 (2d Cir.1995) (quoting *Sage Realty Corp. v. Insurance Co. of N. Am.*, 34 F.3d 124, 128 (2d Cir.1994)). Under the four-part test, "[a] court can reject a request for discovery, even if properly and timely made through a Rule 56(f) affidavit, if it deems the request to be based on speculation as to what potentially could be discovered." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir.1994).

■ The Funds have not satisfied this standard. The affidavit submitted by the Funds' counsel states that Funds would like to conduct depositions of Tunick, Frank Lupo, and other service providers who allegedly have knowledge of Tunick's activities in connection with the real estate transactions. The Funds claim that Tunick, Arthur Blau, and Frank Lupo will be able to shed light on Tunick's role in connection with the due diligence of the 18th Street Building, and

---

8. Those appraisals were in fact prepared for the Funds at the behest of their counsel, Wilfred L.

Davis & Stephen Davis, P.C.

Wilfred Davis (who allegedly obtained the appraisals on the building) and Roger Levin (who kept minutes of the Trustees' meetings) should provide information regarding the basis for why Tunick was understood to have an attorney-client relationship with the Funds.

Tunick has already attested that no attorney-client relationship between him and the Funds existed at the time of the real estate transactions at issue. Moreover, as recognized in the *Albanese Decision,* relief under Rule 56(f) is not appropriate where the discovery allegedly desired " 'pertain[s] to information already available to [the non-moving party].' " *Albanese Decision,* 958 F.Supp. at 894 (quoting *Frankel v. ICD Holdings S.A.,* 930 F.Supp. 54, 66 (S.D.N.Y.1996)). The Funds' central allegation in the instant case—as it was against the Albanese Defendants—is that they had a contractual relationship with Tunick at the time of the subject real estate transactions. As explained in the *Albanese Decision,* the Funds

> should be able to demonstrate as much through their own witnesses and documents. Their failure to do so confirms that no evidence of an attorney-client relationship existed between the parties, and militates against their request for a continuance. *See Paul Kadair, Inc. v. Sony Corp.,* 694 F.2d 1017, 1032 (5th Cir.1983) (request for stay under Rule 56(f) denied because "evidence in refutation of [movant's] averments and in support of [the opposing party's] conspiracy claim was available to [the opposing party] if its allegations of conspiracy were true").

*Id.* at 895.

Notwithstanding that the Funds have added more names of witnesses to be deposed (than against the Albanese Defendants) and have stated reasons their efforts to depose have been hampered thus far, they fail in demonstrating how the information requested creates an issue of material fact concerning the existence of an attorney-client relationship. The Funds do not seek concrete evidence of a relationship, such as a retainer, but rather information that may or may not boost their assertions that Cunningham relied on Tunick's advice regarding the 18th Street Building transaction, that the Funds believed there to be an attorney-client relationship, and/or that any other witnesses believed such a relationship existed. These additional facts cannot "create a genuine issue of material fact" under the relevant standard, as they must to satisfy Rule 56(f). Absent written documentation of an attorney-client relationship and given Tunick's attestation that none existed, the only other party that needs to be heard on the subject is the Funds themselves, and no discovery is needed for that. Accordingly, the Funds' request for a continuance is denied.

### *Conclusion*

For the reasons set forth above, Defendant Tunick's motion for summary judgment is hereby granted.

It is so ordered.